STATE OF NEBRASKA, APPELLEE,
v. JERRY E. KINNEY, APPELLANT.
572 N.W.2d 383

Filed October 14, 1997.   No. A-96-1080.

David L. Kimble, Seward County Public Defender, for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

MILLER-LERMAN, Chief Judge, and SIEVERS and MUES, Judges.

MUES, Judge.

## INTRODUCTION

Jerry E. Kinney was convicted in a bench trial of possession of methamphetamine, possession of alprazolam, possession of marijuana, possession of drug paraphernalia, possession of illegal fireworks, and failure to signal. Kinney now appeals those convictions. The only issue presented by this appeal is whether the trial court erred in denying Kinney's motion to suppress evidence the police obtained from his automobile.

## FACTS

Kinney was charged with one count of possession of methamphetamine and one count of possession of alprazolam, Class IV felonies under Neb. Rev. Stat. § 28-416(3) (Cum.

Supp. 1994); possession of marijuana, an infraction under § 28-416(11)(a); possession of drug paraphernalia, an infraction under Neb. Rev. Stat. § 28-441 (Reissue 1995); possession of illegal fireworks, a Class III misdemeanor under Neb. Rev. Stat. §§ 28-1244 and 28-1250 (Reissue 1995); and failure to signal, a traffic infraction under Neb. Rev. Stat. § 60-6,161 (Reissue 1993). Prior to trial, Kinney filed a motion to suppress all evidence seized from his person and his motor vehicle. At the hearing on the motion to suppress, the following facts were introduced:

On August 5, 1994, Nebraska State Patrol Trooper Russell Stanczyk had just completed a traffic stop and was merging onto Interstate 80 when he noticed Kinney's vehicle change lanes without signaling. Stanczyk activated his patrol car's overhead lights, and Kinney pulled off to the side of the road. Stanczyk then proceeded to the driver's side of the car and asked Kinney for his driver's license and vehicle registration. While requesting these documents, Stanczyk observed a gold-colored badge on the console of Kinney's car, a police scanner which was plugged into the cigarette lighter, a pair of binoculars, and a beer can inside of a "coozy."

As Kinney turned his body to reach for the requested documents, Stanczyk observed what he believed to be a semiautomatic pistol in a shoulder holster underneath Kinney's left arm. Prior to the time Kinney turned his body, the pistol was concealed from Stanczyk's view, and Kinney did not inform Stanczyk that he had a weapon. Kinney then pulled out his wallet, which contained another gold-colored badge and Kinney's driver's license. Stanczyk informed Kinney why he was being stopped and asked Kinney to remove the shoulder holster and step back into the patrol car. Stanczyk's patrol car did not have a protective screen to separate him from Kinney, so he conducted a pat-down search before Kinney was seated in the passenger's seat of the patrol car. No additional weapons were found on Kinney's person.

Stanczyk testified that the gold-colored badges had the word "Ombudsman" on them. When he recognized this fact, Stanczyk remembered an earlier incident he had heard about involving Kinney. In September 1993, Kinney was working for

the state ombudsman's office and had gone to the Nebraska State Fair and used his badge and identification card to gain access to a Garth Brooks concert. Kinney was accompanied by a female, and in gaining access, he stated that "he and this female needed to check out the — the way that the security was handled by the State Patrol and UNL police . . . . [B]ecause he was working in his official capacity, [he] [n]eeded to check out these items."

Kinney was allowed into the concert; however, the State Patrol was subsequently informed that Kinney was not performing any official duties and had actually brought his wife to the concert. An intelligence report was then issued so that other troopers would be aware of this for the remainder of the State Fair. Stanczyk was also informed that the ombudsman's office does not issue badges and that Kinney had had the "Ombudsman" badges made up.

Kinney disputes these reports. He testified that he had received an anonymous tip from a state employee "complaining about the nature and the coordination of the security and the safety of the crowds in Devaney Sports Center between the State Patrol and the University of Nebraska Police Department." There were two concerts coming up, the Garth Brooks concert and one that "was more geared for the teenager population," so Kinney decided to attend the Garth Brooks concert as opposed to the other. Kinney testified that his wife did attend the concert, but she paid $50 for tickets and attended the concert with two friends. Kinney also testified that the badges that he carries were issued by the deputy director of the ombudsman's office.

While seated in the patrol car, Stanczyk informed Kinney that he was going to write him a warning ticket. Stanczyk testified that Kinney informed him that he was headed out to do an investigation and "was just driving with his head up his ass." While talking with Kinney, Stanczyk noticed a slight odor of alcohol on Kinney's breath but did not believe Kinney was impaired.

Stanczyk called in Kinney's license for a routine check for suspensions or warrants and was informed by dispatch that Kinney was entered into the State Patrol's "10-38" file. Stanczyk explained that the State Patrol has several codes to

warn officers of potentially dangerous situations. A "10-50" file means use caution when encountering this person. A 10-38 file is the next step above 10-50 and means that the person is potentially dangerous.

Trooper Glen Elwell was working near the area where Stanczyk had stopped Kinney and was monitoring the radio traffic. When dispatch informed Stanczyk that Kinney was entered into the State Patrol's 10-38 file, Elwell recognized the name and radioed Stanczyk 10-78 (for your information), 10-50 (use caution). Stanczyk testified that this communication implied to him that Elwell had personal knowledge of this individual and that he should use caution. Stanczyk testified that he was "suspicious enough of the situation that [he] want[ed] to run a check on the gun that was located on Mr. Kinney's person, run a check on it and make sure it's not stolen," so he requested that Elwell assist him.

While waiting for Elwell to arrive, Stanczyk finished writing out the warning for the traffic infraction and returned Kinney's documents to him. Stanczyk testified that he informed Kinney that he was going to call another officer to come and assist him because he wanted to check Kinney's gun to make sure it was not loaded or stolen. Stanczyk also informed Kinney that he felt he had the authority to search within the reach, grasp, or lunge area of Kinney's driver's seat for any additional weapons that might be concealed. Stanczyk testified that Kinney understood this. When asked whether Kinney offered any resistance, Stanczyk replied, "No, he just responded in an affirmative response." Stanczyk further testified that while waiting for Elwell, Kinney informed him that Kinney was a federally licensed firearms dealer.

Within about 2 minutes, Elwell arrived to assist Stanczyk. While Elwell was watching Kinney, Stanczyk proceeded to Kinney's vehicle. Through his hand-held radio, Stanczyk ran the serial number on the gun and found it was not stolen. Stanczyk removed the magazine and found it was loaded. Stanczyk next opened the console between the driver's seat and passenger's seat and observed what appeared to be an "alligator" clip with a partial marijuana cigarette in it. Next to the marijuana cigarette there was a small metal container which

Stanczyk perceived as a place where additional drugs could be located. Upon further inspection, Stanczyk found three marijuana cigarettes.

Stanczyk also noticed a nylon briefcase behind the driver's seat. When Stanczyk opened up the briefcase, he observed a brown pouch that was large enough to conceal a weapon or a controlled substance. Inside the pouch, there were a small knife, a razor blade, a "snorting tube" with white residue, and a brown-colored bottle with an off-white powdery substance which Stanczyk believed was methamphetamine.

At this point, Stanczyk walked back to Kinney and showed him the brown bottle and asked Kinney if he knew what it was. Kinney responded that he did not know. Stanczyk showed the substance to Elwell, who agreed that it was probably methamphetamine. Kinney was then placed under arrest.

Kinney testified that after Stanczyk gave Kinney the warning ticket, Stanczyk informed him that he was going to run a check on Kinney's gun. Kinney informed Stanczyk that he thought this was pointless because Kinney was a federally licensed firearms dealer, and he showed Stanczyk his federal license. Stanczyk informed Kinney that he had to run the check on the gun anyway, and Kinney replied, "[W]ell, as far as I'm concerned our business is concluded but if you must go ahead and run it and let's get — get on with it." According to Kinney, Stanczyk went to the car and ran the check on the gun. When the check revealed that the gun was not stolen, Stanczyk returned to where Kinney and Elwell were standing and informed Kinney that he was going to search for additional weapons. Kinney again informed Stanczyk that their business was concluded and said "no" when Stanczyk informed him that he was going to search for additional weapons.

Shortly after being placed under arrest, Kinney began complaining of chest pains and was transported to Seward Memorial Hospital by Elwell. While he was at the hospital, one of the nurses approached Elwell and handed him a plastic baggie with an off-white-colored powder inside. The nurse informed Elwell that it had been brought to her attention that Kinney had hidden something under his left buttock and that the nurse had retrieved the item.

Evidence at trial revealed that in a subsequent search of Kinney's car, officers discovered several pistols, a "mini-14," a shotgun, a stun gun, ammunition, fireworks, and a baggie containing 15 yellow tablets which were later determined to be alprazolam.

Following the hearing on Kinney's motion to suppress, the trial court denied Kinney's motion. At the bench trial, held July 31, 1995, the bill of exceptions from the hearing on the motion to suppress was entered into evidence subject to a continuing objection by Kinney. Foundation was laid for the exhibits, and the parties rested. The trial court found Kinney guilty on all counts and sentenced him to intensive supervision probation. Kinney now appeals the admission of the evidence seized from his vehicle.

## ASSIGNMENTS OF ERROR

In the errors which were both assigned and discussed, Kinney alleges the trial court erred in overruling his motion to suppress because the search of his vehicle violated the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution.

## STANDARD OF REVIEW

In reviewing a trial court's ruling on a motion to suppress, an appellate court reviews the ultimate determination of probable cause de novo and reviews the findings of fact made by the trial court for clear error, giving due weight to the inferences drawn from those facts by the trial court. *State v. Nissen*, 252 Neb. 51, 560 N.W.2d 157 (1997).

A trial court's ruling on a motion to suppress, apart from determinations of reasonable suspicion to conduct investigatory stops and probable cause to perform warrantless searches, is to be upheld on appeal unless its findings of fact are clearly erroneous. *State v. Merrill*, 252 Neb. 510, 563 N.W.2d 340 (1997).

To be considered by an appellate court, an error must be assigned and discussed in the brief of one claiming that prejudicial error has occurred. *McArthur v. Papio-Missouri River NRD*, 250 Neb. 96, 547 N.W.2d 716 (1996); *Ford Motor Credit Co. v. All Ways, Inc.*, 249 Neb. 923, 546 N.W.2d 807 (1996); *Standard Fed. Sav. Bank v. State Farm*, 248 Neb. 552, 537 N.W.2d 333 (1995).

## DISCUSSION

Before we begin our discussion, we remind counsel for the State that Neb. Ct. R. of Prac. 9D(1)f and g (rev. 1996) requires that factual recitations be annotated to the record, whether they appear in the statement of facts or argument section of a brief; the failure to do so may result in an appellate court's overlooking a fact or otherwise treating the matter under review as if the represented fact does not exist. *First Westside Bank v. For-Med, Inc.*, 247 Neb. 641, 529 N.W.2d 66 (1995).

*Warrantless Search.*

Although not stated succinctly, we interpret Kinney's first argument as alleging the trial court erred in overruling his motion to suppress because the search of his vehicle violated the Fourth Amendment guarantee to be free from unreasonable searches and seizures. We note that Kinney does not argue that Stanczyk did not have probable cause to make the initial stop of the vehicle.

Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution protect against unreasonable searches and seizures by the government. *State v. Konfrst*, 251 Neb. 214, 556 N.W.2d 250 (1996). Searches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions. *Konfrst, supra.* Less rigorous requirements govern searches of automobiles, not only because of the element of mobility, but because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office. *Id.*

Inasmuch as roadside encounters between police and suspects present especially dangerous situations, on the reasonable belief that a suspect is dangerous and may gain access to a weapon, the police may search those parts of the passenger compartment of a vehicle they have properly stopped where a weapon may be hidden. *State v. DeGroat*, 244 Neb. 764, 508 N.W.2d 861 (1993). See, also, *State v. Gross*, 225 Neb. 798, 408 N.W.2d 297 (1987) (holding officer may search vehicle for

weapons if officer has reasonable belief based on articulable facts that officer or another may be in danger).

In *Michigan v. Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983), two officers were on patrol late one evening when they observed a vehicle swerve off into a ditch. The officers stopped to investigate. The officers had to repeat requests for documents several times before Long responded. One of the officers thought Long " 'appeared to be under the influence of something.' " 463 U.S. at 1036. When Long was requested to produce his vehicle registration, he headed toward the open door of his vehicle. The officers followed Long, and both observed a hunting knife on the floorboard of the driver's side of the vehicle. The officers then did a *Terry* protective pat-down search, which revealed no weapons.

One of the officers then stood with Long at the rear of the vehicle while the other officer shined his flashlight into the interior of the vehicle to search for other weapons. The officer noticed something protruding from underneath the armrest. He lifted up the armrest and saw a pouch containing what appeared to be marijuana. The officers impounded the vehicle and discovered 75 pounds of marijuana.

Long filed a motion to suppress, which was denied. The Michigan Supreme Court reversed, and the State appealed. On appeal, the U.S. Supreme Court observed:

> Our past cases indicate then that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect. These principles compel our conclusion that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons. [Citation omitted.] "[T]he

issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."
463 U.S. at 1049-50.

*Did Officer Have Reasonable Belief That Kinney Was Dangerous?*

Stanczyk stopped Kinney's car at approximately 8:20 in the evening for failing to signal when he changed lanes. When stopped, Kinney volunteered that he was "heading out to do an investigation." Stanczyk testified that he was suspicious of the situation because of "all the — the police type paraphernalia that was in the car, the — the badges, the scanner, wearing a weapon on his person, consuming alcohol, the binoculars. All these things that would portray himself as a — as a police officer." Stanczyk also testified that he had knowledge that Kinney had impersonated a peace officer in the past. Stanczyk was already using caution because Kinney had a gun on his person. Stanczyk then received two radio communications informing him that Kinney was "potentially dangerous" and that Stanczyk should "use caution." Stanczyk testified that when he received the communication from Elwell to use caution, that indicated to him that Elwell either had had previous contact with Kinney or had knowledge of Kinney. Stanczyk felt threatened enough by this situation to contact Elwell for backup. Prior to Elwell's arrival, Kinney informed Stanczyk that he was a licensed firearms dealer. Under these facts, "a reasonably prudent man . . . would be warranted in the belief that his safety or that of others was in danger." However, this does not end our inquiry because, given that Stanczyk's reasonable belief was based in part upon the knowledge of others, we must also determine whether the State Patrol or Elwell had a reasonable belief that Kinney was a danger to Stanczyk or others.

Elwell testified that the federal Bureau of Alcohol, Tobacco, and Firearms (ATF) contacted him because the ATF was going to do an inspection of Kinney's firearms business and the ATF had received information that Kinney was a dangerous person. The ATF requested that Elwell investigate Kinney in order to determine whether the ATF "needed to be more prepared officer safety-wise when going and conducting the inspection."

Elwell investigated Kinney's criminal history and contacted other law enforcement agencies regarding any contacts the agencies may have had with Kinney. Elwell learned that Kinney had been involved in some acts of intimidation against a former spouse; had been charged with terroristic threat activity; and had been "contacted" in connection with impersonating a peace officer. Elwell also knew that Kinney was a firearms dealer and had been known to be in possession of firearms in the past. The State Patrol had issued an "intelligence information" to take precaution when contacting Kinney because of Kinney's desire to be involved in and around law enforcement agencies.

We find that this information, combined with Stanczyk's personal recollections and observations, certainly gave rise to an articulable and objectively reasonable belief that Kinney might be a danger to Stanczyk or others.

Having so determined, we need not comment on whether Kinney's name being on the State Patrol's 10-38 (potentially dangerous) list was sufficient, standing alone, to create a reasonable belief that Kinney was dangerous.

*Significance of Initial Reason for Stop Being Over.*

We interpret Kinney's next argument as alleging that even if the officers did have a reasonable belief that Kinney was dangerous, they had no right to search his vehicle for weapons because Stanczyk had already issued Kinney a warning ticket and given him all of his paperwork back. In other words, if Stanczyk had searched the vehicle while Kinney was legally detained, prior to issuance of the warning ticket, the search would have been legal. However, after Stanczyk issued the warning ticket, Kinney's further detention was illegal, and therefore, the search made during that detention was also illegal. We cannot agree.

█ When an officer has probable cause to stop a vehicle and has a reasonable, articulable belief that his safety may be in danger, the fact that the officer searches the vehicle subsequent to issuing the ticket rather than prior to issuing the ticket does not necessarily render the search invalid. Indeed, the U.S. Supreme Court anticipated such situations in *Michigan v. Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983). The Court stated:

Just as a *Terry* suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a *Terry* suspect in Long's position break away from police control and retrieve a weapon from his automobile. [Citation omitted.] In addition, if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside. [Citation omitted.] Or, as here, the suspect may be permitted to reenter the vehicle before the *Terry* investigation is over, and again, may have access to weapons. In any event, we stress that a *Terry* investigation, such as the one that occurred here, involves a police investigation "at close range," [citation omitted] when the officer remains particularly vulnerable in part *because* a full custodial arrest has not been effected, and the officer must make a "quick decision as to how to protect himself and others from possible danger . . . ."

463 U.S. at 1051-52.

In the present case, Stanczyk had already seen one weapon. Given the knowledge that Kinney was a licensed firearms dealer, plus the other circumstances then known to Stanczyk, including the information that Kinney was potentially dangerous to Stanczyk or to others, it was not unreasonable to assume that there might be additional weapons in the vehicle.

■ The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution prohibit only unreasonable searches and seizures. *State v. Brooks*, 5 Neb. App. 463, 560 N.W.2d 180 (1997). The brief detention necessary to dispel Stanczyk's reasonable belief that his life was in danger was not an unreasonable seizure.

*Scope of Search.*

We interpret Kinney's final argument as alleging that, even if the search for weapons was permissible, Stanczyk improperly extended the scope of his search.

[T]he U.S. Supreme Court held long ago in *Carroll v. United States*, 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925), that a warrantless search of an automobile by police officers with probable cause to believe the vehicle

contains contraband is permissible under the Fourth Amendment. See, also, *State v. Vermuele*, 241 Neb. 923, 492 N.W.2d 24 (1992); *State v. Gerjevic*, 236 Neb. 793, 463 N.W.2d 914 (1990). Probable cause means " 'a fair probability that contraband or evidence of a crime will be found.' " *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989) (quoting *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)).

*State v. Konfrst*, 251 Neb. 214, 229, 556 N.W.2d 250, 262 (1996).

■ In *State v. Watts*, 209 Neb. 371, 307 N.W.2d 816 (1981), this court held that the finding of a quantity of suspected illicit drugs by an officer making a legitimate search of an automobile may serve to substantiate that officer's suspicions and furnish additional probable cause for him to make a complete search of the vehicle. The court reasoned, "Having found a quantity of illicit drugs in one part of the automobile does not sensibly suggest the probability that no more such substance is present."

*Konfrst*, 251 Neb. at 230, 556 N.W.2d at 262.

■ Both this court and the U.S. Supreme Court have relied on the automobile exception to a search warrant requirement in upholding searches of containers found during a probable cause search of a vehicle. When the police have probable cause prior to instituting any search, they may search the entire vehicle (interior compartments and trunk), including any package, luggage, or container that might reasonably hold the item for which they had probable cause to search. See *State v. McGuire*, 218 Neb. 511, 357 N.W.2d 192 (1984). See, also, *California v. Acevedo*, 500 U.S. 565, 111 S. Ct. 1982, 114 L. Ed. 2d 619 (1991); *United States v. Ross*, 456 U.S. 798, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982).

*Konfrst*, 251 Neb. at 230-31, 556 N.W.2d at 262.

Stanczyk testified that he initially looked in the console between the seats to search for weapons. Upon opening the console, Stanczyk discovered an alligator clip with a marijuana cigarette. Stanczyk then properly extended his search to include places that could conceal drugs as well as weapons.

*Consent.*

We are cognizant that Kinney devoted a portion of his brief to a discussion of whether he voluntarily consented to the search. See *State v. Ready*, 252 Neb. 816, 565 N.W.2d 728 (1997) (discussing requirements necessary for determination of whether consent was voluntary). However, in the present case, the trial court did not base its decision on the voluntariness of Kinney's consent, and the State does not argue that Kinney consented. Moreover, because we have already determined that the search was not unreasonable based upon Stanczyk's reasonable, articulable belief that he might be in danger, we need not address this argument. See *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994) (holding appellate court is not obligated to engage in analysis not needed to adjudicate controversy).

## CONCLUSION

Upon our de novo review, we conclude that Stanczyk had a reasonable, articulable belief that Kinney was dangerous and might gain access to a weapon if permitted to return to his vehicle. Upon searching the vehicle for possible weapons, Stanczyk discovered contraband and then properly extended his search to include both contraband and weapons. Having found that the search did not violate Kinney's constitutional right to be free from unreasonable searches and seizures, we find that the trial court did not err in overruling Kinney's motion to suppress.

AFFIRMED.