First Westside Bank, a state banking corporation, appellee, v. For–Med, Inc., a Nebraska corporation, and David R. Anderson, individually, appellants.

529 N.W.2d 66

Filed March 24, 1995.   No. S–94–247.

Gary L. Dolan, of Wolfe, Anderson, Hurd, Luers & Ahl, for appellants.

James M. Kelley for appellee.

White, C.J., Caporale, Fahrnbruch, Lanphier, Wright, and Connolly, JJ.

CAPORALE, J.

This is the second appearance in this court of the within action at law for a deficiency judgment under the Uniform Commercial Code. While in the first appearance there was no question concerning the notice of the sale of the collateral given the corporate debtor–appellant therein and herein, For–Med, Inc., and while we held that the individual debtor–appellant therein and herein, David R. Anderson, had received constructive notice of said sale, we nonetheless further held that the district court had erred in entering summary judgment in favor of the creditor–appellee therein and herein, First Westside Bank. This was so because no evidence had been presented from which the district court could have found that the sale was commercially reasonable. As a consequence, we reversed the judgment in favor of First Westside and remanded the cause for further proceedings. *First Westside Bank v. For–Med, Inc.*, 240 Neb. 219, 481 N.W.2d 193 (1992) (*First Westside I*). The proceedings giving rise to this second appearance then took place, which again resulted in the district court entering judgment in favor of First Westside in the sum of $18,735.04 plus interest and costs. While For–Med and Anderson concede that the price First Westside obtained for the collateral was not "wholly unreasonable," they nonetheless appealed to the Nebraska Court of Appeals, urging that the district court erred in finding the sale to have been commercially reasonable. However, because this court had decided *First Westside I*, the appeal was docketed in this court. We now affirm the judgment of the district court.

The dispute is controlled by Neb. U.C.C. § 9–504 (Reissue 1980), which read in pertinent part:

(1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. . . .

(2) If the security interest secured an indebtedness, the secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiency. . . .

(3) Disposition of the collateral may be by public or

private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.

Whether a sale of collateral was commercially reasonable within the meaning of § 9-504(3) is a question of fact. *Chadron Energy Corp. v. First Nat. Bank*, 236 Neb. 173, 459 N.W.2d 718 (1990). Thus, in reviewing this matter, we are bound by the rule that in a bench trial of a law action, the trial court's factual findings have the effect of a verdict and will not be set aside on appeal unless they are clearly wrong. *Label Concepts v. Westendorf Plastics, ante* p. 560, 528 N.W.2d 335 (1995); *Gibb v. Strickland*, 245 Neb. 325, 513 N.W.2d 274 (1994); *Diefenbaugh v. Rachow*, 244 Neb. 631, 508 N.W.2d 575 (1993); *Mix v. City of Lincoln*, 244 Neb. 561, 508 N.W.2d 549 (1993).

With that scope of review in mind, and recalling that where a secured party seeks a deficiency judgment, it is that party's burden to show the reasonableness of the sale of collateral, *First Westside I* and *Adams State Bank v. Navistar Financial Corp.*, 229 Neb. 334, 426 N.W.2d 525 (1988), we turn our attention to the facts as revealed by the record. In doing so, we note that the parties recite many of the facts in the argument portions of their briefs without annotating them to the record. Neb. Ct. R. of Prac. 9D(1)f and g (rev. 1992) clearly requires that factual recitations be annotated to the record, whether they appear in the statement of facts or argument section of a brief. The failure to do so may result in an appellate court's overlooking a fact, *State v. Hernandez*, 242 Neb. 78, 493 N.W.2d 181 (1992), or otherwise treating the matter under review as if the represented fact does not exist, *Alder v. First Nat. Bank & Trust Co.*, 241 Neb. 873, 491 N.W.2d 686 (1992). Because in this instance the factual record is relatively short, we have undertaken our own search through it to verify the unannotated facts. We caution, however, that this should not be understood to mean that we shall undertake such a task in any future case.

That having been clarified, we move on. On June 24, 1983,

the parties executed a loan and security agreement in the amount of $79,924.89 plus interest, using Anderson's 1978 Blue Bird motor home as collateral. Anderson and For–Med defaulted on the loan, and First Westside elected to accelerate payment and put Anderson and For–Med in default.

After repossession of the collateral, First Westside sold it at private sale for $60,000 and applied the proceeds to Anderson's and For–Med's obligation.

All of the evidence in regard to the manner in which the collateral was sold came from First Westside. There was no normal bank procedure for selling motor homes, and although most motor vehicles it sold were advertised in a local newspaper, First Westside elected not to advertise the collateral. It explained that the motor home was very large and could not be left on its parking lot; thus, it was not available to show to just anyone who might be interested in a motor home. Instead, First Westside solicited sealed bids by word of mouth from other financial institutions, dealers, and certain of its customers.

According to the record, there existed no local Blue Bird motor home dealer; the nearest one was in Michigan. Conventions of Blue Bird motor home owners are held a few times a year, at which one can get an idea as to what is available. In addition, magazines exist in which Blue Bird and other motor homes are advertised. These magazines have national circulation, with a $2^{1}/_{2}$–month timelag between the placing of an advertisement and its publication.

First Westside received three bids, and the collateral was purchased by a First Westside customer. The purchaser described himself as "more of a user than a dealer" of recreational vehicles, but deemed himself "very familiar" with the Blue Bird line of motor homes, having owned two in the past. He described such motor homes as top of the line, saying, "[T]hey are considered one of the premium of all motor homes, very expensive, but very durable and very safe. I think most people would love to have a Blue Bird." There is a limited supply of Blue Bird motor homes, as the Blue Bird company tries not to saturate the market. According to the purchaser, these motor homes are unique, and there are not a lot of ways to sell them, a fact he communicated to First Westside.

The purchaser claimed that before submitting his bid, he researched the situation. There were only about 10 Blue Bird dealers, and their names were not easily found unless one was familiar with them. The purchaser estimated that in 1983, a brandnew Blue Bird motor home would have cost $120,000 to $130,000, depending on equipment. Further, Blue Bird motor homes depreciate at the rate of about 8 percent per year for the first 7 or 8 years, with a greater amount the first year, like an automobile. Depreciation slows after that.

The purchaser's firm maintained its own fleet of vehicles, and after the purchaser got a cursory look at the motor home in question, he had it taken to the firm's shop in order for its chief mechanic to inspect it in more depth. After the inspection, the purchaser made a $57,500 bid. First Westside declined that bid, and the purchaser then bid $60,000. That bid was also refused initially, but was accepted several days later. This amount is what the purchaser thought the motor home was worth at the time.

Repairs were necessary to get the unit in proper operating condition. The coach was in "fairly dirty condition," and the carpet had to be removed. The drapes were cleaned and the refrigerator was replaced. All in all, there were 34 items of repair costing $22,000, including the replacement of the engine; ruptured plumbing; the rear, central, and bath furnaces; and the generator exhaust system.

Two and one-half years later, it took the purchaser 6 months to sell the unit through word of mouth for $58,000.

The primary thesis advanced by For-Med and Anderson is that the sale of the collateral was not commercially reasonable because its availability was not advertised sufficiently. It has been written that with regard to security transactions, the purpose of the Uniform Commercial Code is to protect both the creditor and the debtor; on the sale of collateral, it is the secured party's duty to the debtor to use all fair and reasonable means to obtain the best price under the circumstances, but the creditor need not use extraordinary means. See *Vic Hansen & Sons, Inc. v. Crowley*, 57 Wis. 2d 106, 203 N.W.2d 728 (1973).

In *Chrysler Dodge Country v. Curley*, 782 P.2d 536 (Utah App. 1989), the truck repossessed was in rough condition.

After it was repaired and cleaned, it was placed on the creditor's regular lot for sale. As it generated little interest, three private bids were solicited and the truck was sold. In rejecting the debtor's complaint that the bid solicitation and advertising had been inadequate, the Utah court, under a rule considering the question of commercial reasonableness to be a fact–sensitive question of law, concluded that while the notification of potential buyers is of great importance, public advertising is not mandatory. It thus ruled that advertising the truck on the lot for 2¹/₂ months and then soliciting bids and accepting the highest bid, which was higher than the book value of the vehicle, made the sale commercially reasonable.

As noted in *Security Federal S. & L. v. Prendergast*, 108 N.M. 572, 775 P.2d 1289 (1989), the determination of whether a particular sale was commercially reasonable turns on the particular facts of each case, and under particular circumstances, a sale may be commercially reasonable notwithstanding the lack of advertising. See, also, *Hall v. Owen Co. State Bank et al.*, 175 Ind. App. 150, 370 N.E.2d 918 (1977).

Among the other factors to be considered in determining whether a sale of collateral was commercially reasonable is the adequacy or insufficiency of the price at which it was sold. *First Nat. Bank of Omaha v. Kizzier*, 202 Neb. 369, 275 N.W.2d 600 (1979). Here, the collateral was resold 2¹/₂ years after the purchaser acquired it, for an amount far less than he had invested in its purchase and repair. In light of that circumstance and the admission of For–Med and Anderson that the price at which the collateral was sold was not "wholly unreasonable," it cannot be said that the district court's finding that the sale was commercially reasonable is clearly wrong.

Accordingly, the judgment of the district court is, as noted in the first paragraph hereof, affirmed.

AFFIRMED.