COLDWELL BANKER TOWN & COUNTRY REALTY OF HASTINGS, INC., APPELLANT, V. B. CHARLES JOHNSON AND BETTY J. JOHNSON, HUSBAND AND WIFE, APPELLEES.

544 N.W.2d 360

Filed March 8, 1996. No. S-94-272.

Gene C. Foote II for appellant.

David B. Downing, of Downing, Alexander & Wood, for appellees.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

CAPORALE, J.

In this breach of contract action the plaintiff–appellant, Coldwell Banker Town & Country Realty of Hastings, Inc., seeks damages resulting from the failure of the defendants–appellees, B. Charles Johnson and Betty J. Johnson, husband and wife, to pay a commission allegedly owed under an agreement entered into by and between the parties. Following a bench trial, the district court dismissed Coldwell Banker's petition. Coldwell Banker then appealed to the Nebraska Court of Appeals, asserting that the district court erred in ruling as it did. In order to regulate the caseloads of the two courts, we, on our own motion, moved the appeal to our docket. We now affirm the judgment of the district court.

In a bench trial of a law action, the trial court's factual findings have the effect of a verdict and will not be set aside on appeal unless they are clearly wrong. *McCook Nat. Bank v. Bennett*, 248 Neb. 567, 537 N.W.2d 353 (1995); *Lincoln Lumber Co. v. Fowler*, 248 Neb. 221, 533 N.W.2d 898 (1995); *First Westside Bank v. For–Med, Inc.*, 247 Neb. 641, 529 N.W.2d 66 (1995).

Following the filing of a lis pendens by the Federal Land Bank, the Johnsons signed an agreement listing their improved farmland for sale by Coldwell Banker. This listing agreement provided for a sale price of $450,000 or other terms acceptable to the Johnsons, and the Johnsons agreed to pay Coldwell Banker a cash fee of 5 percent of the gross sale price if, before March 31, 1987, a sale was made or a purchaser was found who was ready, willing, and able to purchase the property.

Coldwell Banker sold part of the property to third parties for $90,000 and was paid a commission of $4,500. A nephew of

the Johnsons then contacted Coldwell Banker and informed it that he had relatives in California, Stephen and Joan Tolliver, who were interested in acquiring the remaining Johnson property. Coldwell Banker and the nephew proposed that the Tollivers trade unimproved Nebraska property Joan Tolliver had inherited for the remaining Johnson property. On January 30, 1987, the Tollivers executed an offer to purchase the remaining Johnson property. However, the Johnsons did not execute the offer which had been prepared for their purchase of the Tolliver property.

As of March 31, 1987, no agreement for the trade had been reached. One of the many problems in executing such an agreement was that the Federal Land Bank held a $450,000 mortgage and was unwilling to consent to the exchange unless the Tollivers paid an additional sum of approximately $51,000. The Tollivers were, as of the expiration date of the listing agreement, unwilling to do this.

On April 3, 1987, the Tollivers, without the participation of Coldwell Banker, entered into negotiations with the Johnsons' attorney for the purchase of the remaining Johnson property. As a result, purchase agreements were executed calling for an exchange of the two properties whereunder the Tollivers would acquire the remaining Johnson property and the Johnsons would acquire the Tolliver property. The Tollivers agreed to pay an additional sum of $25,000, and the Johnsons were to take out a new loan from the Federal Land Bank in the amount of $37,000. The additional consideration, the new loan, the net sale proceeds of the portion of the Johnson land sold previously, and the value of the Tollivers' property totaled $450,000.

The exchange agreements were subject to a number of contingencies remaining to be resolved. First, the Federal Land Bank needed to release the mortgage it held on the Johnson property and to approve the $37,000 loan to the Johnsons. In addition, the Federal Land Bank needed to freeze the balance due on the mortgage without additional interest.

Second, other agreements had to be reached with the Tollivers concerning the crop proceeds from the two properties. The negotiations regarding rights to the 1987 crops were complicated by the fact that the Federal Land Bank could not

accept certain federal program payments because it had exhausted the limit of such amounts it could receive.

Third, the Tollivers were unwilling to complete the exchange unless arrangements were made to convert certain grain–handling equipment on the remaining Johnson property to a storage facility and to lease the facility to a commercial elevator.

Fourth, in order. for the Tollivers to be in a position to pay the additional $25,000, they had to borrow money by increasing their loan from The Equitable Life Assurance Society of the United States, which held a first mortgage on their property. This required a complete requalification of the loan and a release of Equitable's mortgage on the property.

These contingencies were all ultimately met, and the closing took place on October 19, 1987.

Coldwell Banker first argues that it is entitled to a commission based on the sale of the remaining Johnson property because it continued working for them notwithstanding the expiration of the listing agreement, if not actively, then through the Johnsons' attorney, "who had more or less assumed the shoes of [Coldwell Banker] in negotiating the final agreement with the Federal Land Bank." Brief for appellant at 1.

But the Johnsons' attorney testified that he was never hired nor paid by Coldwell Banker. It would indeed be a strange result if an attorney, while negotiating a transaction on behalf of a client, suddenly found himself or herself to be the agent of some third party. Little wonder, therefore, that Coldwell Banker cites no authority for such a proposition.

But Coldwell Banker also claims that it is entitled to a commission because

> [w]here a real estate broker, while his brokerage contract is in full force and effect, obtains a purchaser for real estate and no sale is made during the existence of the agreement but sale is made thereafter by the owner to the person produced by the agent, on substantially the terms that had been offered through the agent's efforts, the broker is entitled to a commission for making the sale.

*Byron Reed Co., Inc. v. Majers Market Research Co., Inc.*, 201 Neb. 67, 71-72, 266 N.W.2d 213, 215 (1978). See *Marathon Realty Corp. v. Gavin*, 224 Neb. 458, 398 N.W.2d 689 (1987). The real issue, therefore, is whether the eventual sale of the Johnson property to the Tollivers was on substantially the same terms offered through Coldwell Banker's efforts.

The January 30, 1987, offer of the Tollivers was for them to purchase the Johnson property for $365,000: $5,000 as a downpayment and $360,000 cash upon closing. Contemporaneously with that offer to purchase, the Tollivers offered to sell their property to the Johnsons for $365,000: $1 down and $364,999 cash upon closing. These are obviously not substantially the same terms as were eventually agreed to by the Tollivers and Johnsons after the listing agreement expired.

The executed purchase agreements did provide for an exchange of properties; however, there the similarities end. The executed agreements also provided for the payment of an additional $25,000 by the Tollivers and the receipt of a loan in the amount of $37,000 by the Johnsons. Neither the Tollivers nor the Johnsons had been willing to do this as of the expiration of the listing agreement between the Johnsons and Coldwell Banker. In addition, none of the various contingencies had been negotiated or agreed upon by the expiration date, and some had not even been considered.

This case is controlled by our opinion in *Huston Co. v. Mooney*, 190 Neb. 242, 207 N.W.2d 525 (1973). Therein, a real estate broker brought an action to recover a commission alleged to have been earned for procuring a purchaser of real estate pursuant to the terms of the listing agreement. The listing agreement provided for a cash sale of $20,000 or terms that were acceptable to the owner. During the time the listing agreement was in effect, the broker wrote to the owner, stating that a potential buyer had been located who would pay $1,000 down somewhat as an option, holding the property for 6 months, at which time interest of 8 percent would commence and the buyer would pay an additional $4,000. The buyer would pay an additional $5,000 1 year after the contract was entered into and the balance of $10,000 6 months later, or in two semiannual payments of $5,000. The owner did not consent.

Approximately 3 months after the expiration of the listing agreement, the owner sold the property for $20,000 cash plus abstracting costs to the party with whom the broker had been negotiating. There was no evidence in the record to indicate that the broker was at any time able to obtain from the buyer an offer to purchase for $20,000 cash.

We held that, on these facts, the broker was not entitled to a commission. We found that the record supported the conclusion that the consummation of the sale upon terms acceptable to the owner was the result of efforts of the owner himself after the listing had expired. We went on to write:

> Ordinarily a real estate broker, who for a commission undertakes to sell land on certain terms and within a specified period, is not entitled to compensation for his services unless he produces a purchaser within the time limited who is ready, able, and willing to buy upon the terms prescribed. [Citation omitted.] Where a real estate broker obtains a purchaser for real estate and no sale is made during the existence of the agreement but sale is thereafter made by the owner to the person produced by the agent but not on substantially the terms that had been offered through the agent's efforts, the broker is not entitled to a commission for making the sale.

*Id.* at 245, 207 N.W.2d at 527. See *The Nebraskans, Inc. v. Homan,* 206 Neb. 749, 294 N.W.2d 879 (1980).

In this case, neither the list price nor the January 30 offer of the Tollivers was on substantially the same terms as were finally agreed upon. The record before us also supports the conclusion that the consummation of the sale on terms acceptable to both the Johnsons and the Tollivers was the result of the work of the Johnsons' attorney, not of anything done by Coldwell Banker. Under these circumstances, the district court as the finder of fact could well conclude that it was the Johnsons' attorney, not Coldwell Banker, who negotiated the final agreement with the Tollivers and also with the Federal Land Bank.

Accordingly, the judgment of the district court cannot be said to be clearly wrong.

AFFIRMED.