IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. OSUNA VELIZ

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

VICTOR M. OSUNA VELIZ, APPELLANT.

Filed October 3, 2023.    No. A-22-771.

Appeal from the District Court for Lancaster County: KEVIN R. MCMANAMAN, Judge. Affirmed.

Kristi Egger, Lancaster County Public Defender, and William R. Harris for appellant.

Michael T. Hilgers, Attorney General, and Nathan A. Liss for appellee.

BISHOP, ARTERBURN, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Victor M. Osuna Veliz appeals from his conviction of first degree sexual assault. He contends that the trial court erred in allowing certain expert witness testimony over defense counsel's objection, that the evidence was insufficient to support his conviction, that the sentence imposed was excessive, and that his trial counsel was ineffective. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

In the fall of 2021, the victim and her friends, Taryn D. and Alexandra B., were freshmen at the University of Nebraska at Lincoln. In the evening hours of September 22, 2021, the three friends went to the birthday party of a man that Taryn had met online. During that birthday party, which took place in a trailer park, the victim claimed that she was sexually assaulted by Osuna

Veliz. That evening, the victim went to the hospital and underwent a SANE examination. As a result of the incident, Osuna Veliz was charged with first degree sexual assault, a Class II felony.

## 1. TRIAL

The trial in this matter was held over 4 days in September 2022. During the trial, the State called numerous witnesses including the victim; Taryn, Alexandra, Maggie D., and Cale G., all of whom were friends of the victim; Sharon Regnier, the SANE nurse who conducted the examination of the victim; and Anne Boatright, the State Forensic Nursing Coordinator and Sexual Assault Payment Program Administrator for the Nebraska Attorney General's Office. Osuna Veliz testified in his own defense.

The evidence at trial established that, on September 22, 2021, the victim and Alexandra were planning on having a movie night at their dorm. However, Taryn wanted to attend a birthday party for Lucas Harwood who she had met online. Since Taryn had never met Harwood in person, the victim and Alexandra decided to accompany Taryn to the party so that Taryn would not be attending the party alone.

### (a) Testimony Regarding Events of September 22, 2021

Since none of the girls were familiar with Lincoln, they used GPS to find the address provided to them for the party. The girls arrived at the address a little bit after 9 p.m., which was located in a trailer park. Although the victim and Alexandra expressed concern about the safety of the location, they decided to stay after Harwood approached their car and greeted them. The party was a small gathering consisting of the three girls and Harwood, Robert "RJ" Kirkland, and Osuna Veliz, who was using the alias "Hector." Initially, the group sat outside, talked, and drank some alcoholic beverages, but none of the group was drunk. After a while, Taryn and Harwood broke off from the group. The others continued drinking and talking outside but, eventually, they got cold and went inside the trailer. Once inside the trailer, Alexandra and "RJ" sat on a couch to watch a movie and Osuna Veliz led the victim to the bedroom.

Once they were in the bedroom, Osuna Veliz and the victim started kissing, which the victim testified that she was comfortable with. However, when Osuna Veliz started taking off the victim's clothes, she told him that her friends were "probably looking" for her. According to the victim, he "shushed" her, continued taking off her clothes, then took off his own clothes. The victim stated that as Osuna Veliz kissed her breasts, she shook her head "no" but Osuna Veliz engaged in penile-vaginal intercourse with her. The victim stated that she told Osuna Veliz, "no," and again said, "my friends are here. They're looking for me," but Osana Veliz "shushed" her again and continued engaging in intercourse. The victim testified that the intercourse was painful. The victim again told Osuna Veliz that "my friends were here and I needed to go." The victim testified that Osuna Veliz then started penile-anal intercourse at which point she "jolted" and "tried to push up with her hands." The victim testified that she again told Osuna Veliz "no" and said "I need to go." According to the victim, every time she told Osuna Veliz "no" or that she had to go, he would "either shush me and shake his head or he wouldn't say anything at all." She further testified that although she considered trying to fight Osuna Veliz off of her, she did not feel that she would be successful because he was on top of her. She also testified that she thought about screaming for help but she "was a virgin before," that she "[didn't] think that she knew what was

happening" and that she "was in shock." At that point, Osuna Veliz left the bedroom to go use the bathroom. The victim found her clothes and started to get dressed, but Osuna Veliz came back into the bedroom and again started removing her clothes. The victim told Osuna Veliz, "I hear my friends. I need to go. No." However, Osuna Veliz again "shushed" her, fully undressed her, and engaged in penile-vaginal intercourse again. The victim stated that she continued to tell Osuna Veliz "no" and that she could hear her friends, but he continued. The victim testified that she heard one of her friends knock on the bedroom door, but she did not respond because she "couldn't speak" because she "was in shock." However, she did tell Osuna Veliz again that, "I really need to go. I need to go now." Osuna Veliz eventually left the bedroom to use the bathroom again.

The victim located her clothes which were scattered around the room and started to get dressed again, but Osuna Veliz came back into the bedroom, removed her clothes, pushed her onto the bed, and engaged in penile-vaginal intercourse for the third time. At this point, the victim stated that she "went numb" and that she "couldn't speak," "couldn't keep my eyes open," and "couldn't keep my head still." When Osuna Veliz left the bedroom again to use the bathroom, the victim located her clothes and got dressed but put her bra and underwear in her pocket to speed the process and left the bedroom. The victim testified that, although she had a cell phone, it was in the pocket of her hoodie, which Osuna Veliz had thrown across the room and she could not access it.

When the victim left the bedroom, she was "frazzled" and she found her friends and told them that she "needed to go." Alexandra testified that the victim "[s]eemed a little off" when she came out of the bedroom and that it "[s]eemed like she was trying to put up a front." The victim and Alexandra found Taryn and the three of them left. Taryn testified that, on the car ride home, the victim told them that she just had sex for the first time but did not give any other details. Alexandra testified that once they were in the car, the victim was "hysterical" and that she was laughing a "weird laugh . . . like something's up."

When the girls got back to their dorm, they entered a first-floor bathroom at which time Taryn and Alexandra noticed that the victim had a "fat lip" and blood on her clothes. Taryn testified that the victim's clothes were "covered with blood" and her lip "was very swollen." Alexandra testified that the victim's "lips were swollen, like she got beaten up" and her clothing was bloody and "messed up." When Taryn and Alexandra asked the victim questions, the victim started crying and recounted what had happened at the trailer and that she told Osuna Veliz that she "had to go and that he needed to stop." According to Taryn, the victim became "hysterical," was crying, "very scared," and "in shock." Taryn testified that the victim said that she consented to having sex with Osuna Veliz the first time, but not the second and third times.

After leaving the bathroom, the girls went up to their floor and talked with another friend, Maggie. As Alexandra and Taryn told Maggie what had occurred, the victim continued "sobbing and screaming." The victim was crying, became hysterical, appeared to be in "utter shock," became unsteady on her feet, and fell into Taryn's arms. Another friend, Cale, joined the group and stated that the victim was crying, appeared to be in shock, and was "sitting on the floor kind of in a half-fetal position, half-crisscross position rocking back and forth, and just repeated the same words over and over again."

After speaking with her friends, the victim agreed to go to the hospital. Before they left, the victim changed clothes and they put the victim's bloody clothes into a bag which they took to the hospital. Maggie called the victim's parents, who met them at the hospital.

After arriving at the hospital, the victim was checked in and was taken to an exam room accompanied by Maggie. According to Maggie, the victim, "was very quiet, almost kind of drifting off into space, and kind of just zoning out. She wasn't really there." Maggie also testified that she saw bruising on the victim's body.

The victim was examined at the hospital by Sharon Regnier, who is a Sexual Assault Nurse Examiner ("SANE nurse"). SANE nurses receive specialized training in how to care for patients who report being sexually assaulted. When Regnier first entered the room, the victim "appeared very tired and numb" and had "a flat affect, meaning she wasn't very expressive. Just very closed down." Regnier spoke with the victim about what happened that night. The victim reported penile-vaginal penetration, penile-anal penetration, and digital penetration of both her vagina and anus. Regnier then conducted an external examination of the victim. During that external examination, Regnier observed that the victim had a swollen lip and what appeared to be biting and bruising on her breasts. Regnier also conducted an examination of the victim's genital area which she observed was reddened, inflamed, and was bleeding. Additionally, she testified that there was tearing on the victim's clitoral hood and that the victim's hymenal tissue was "severely reddened, bruised, and swollen . . . not what a normal vaginal opening would appear like, or what hymenal tissue would look like." Regnier, who has performed approximately 20 SANE exams, testified that although the victim's vaginal injuries were not the worst injuries that she had seen, they were "towards the top of the worst." As part of the SANE exam, Regnier took vaginal swabs from the victim. The SANE kit and the victim's bloody clothes were turned over to law enforcement.

After being released from the hospital, the victim returned to her parents' home. During the first few days that the victim was home, two Lincoln police officers came to interview her about the incident and photograph her injuries. The victim had vaginal pain for about 1½ weeks, wore adult diapers due to continued bleeding, wore ice packs to help with her vaginal pain, and started having panic attacks.

(b) DNA Evidence

The SANE kit and DNA samples from the victim and Osuna Veliz were submitted to the Nebraska State Patrol Crime Lab for DNA testing. The results were as follows:

- On the vaginal swab obtained from the victim, sperm fraction testing identified the victim as the major DNA contributor and identified a minor male contributor with the odds being $1.36 \times 10$ to the 26th times more likely that the DNA was from the victim and Osuna Veliz than from the victim and an unknown, unrelated individual. Written out, this number would be 1.36 followed by 24 zeroes.
- On the victim's exterior genital swab, epithelial testing identified the victim as the major contributor and another contributor with the odds being $3.14 \times 10$ to the 11th times more likely that the DNA was from the victim and Osuna Veliz than the victim and an unknown, unrelated individual. This number would fall between 1 billion and 1 trillion. Also on the victim's genital exterior swab, a sperm fraction analysis detected 2 contributors with the odds being $2.81 \times 10$ to the 12th more likely that the DNA was from the victim and an unknown, unrelated person than two unknown individuals and it was $7.14 \times 10$ to the 27th times more likely that the DNA was from Osuna Veliz and an unknown individual than

from 2 unknown, unrelated individuals. Based upon these results, the victim and Osuna Veliz were both identified or included as contributors to the mixture of DNA.

### (c) Anne Boatright Testimony

The State's final trial witness was Anne Boatright, the State Forensic Nursing Coordinator and Sexual Assault Payment Program Administrator for the Nebraska Attorney General's Office. Boatright testified that she is a forensic nurse examiner, a certified SANE nurse, as well as a SANE-A nurse which is an additional adult/adolescent certification. Boatright stated that she has performed over 500 SANE exams, that she developed the 12-page form that is used in every SANE examination in Nebraska, that she trains SANE nurses throughout Nebraska, and that she has testified as an expert witness regarding sexual assault at least 25 times.

As it related to this case, Boatright testified that after reviewing the evidence, including the SANE exam report and the photographs of the victim's injuries, she had only seen a few patients with the amount of clitoral hood tearing experienced by the victim and opined that the tearing would cause bleeding and would have been "extremely painful." She further explained that sexual interactions do not typically cause such injuries because the clitoral hood is not penetrated during normal vaginal penetration. She also explained that research indicates that sexual assaults would involve some sort of genital injury in 20 to 25 percent of cases but that, in her experience, less than 20 percent of sexual assaults involve genital injuries. Finally, Boatright testified that in her opinion, the victim's injuries were not consistent with consensual sex due to the "level of injury and the amount of tearing" that was present. She noted that a consensual sexual encounter would not typically cause that type of injury because the pain caused "would have been really significant" and in a consensual sexual encounter "you wouldn't want it to hurt that bad."

Boatright also testified regarding how the human brain processes trauma, such as a sexual assault:

So, essentially what we know about victims who experience traumatic events . . . is that your prefrontal cortex located right underneath . . . your frontal lobe, is going to shut down typically in a traumatic event.

Our prefrontal cortex is what controls our chronological thinking. It's like a filing cabinet that puts things in perfect order for us.

And so, when trauma happens, we don't have that functioning.

Our functioning is going to go to our center brain . . . And memories are typically going be stored on post-it notes, so they're going to be stored over here, here, here, here, and here, and not in chronological order.

This can make it very difficult to interview patients because they may not remember things all at once. They may be exhausted. Your adrenaline wears out and so, that too comes down, and so your body is not remembering everything perfectly . . .

Following Boatright's testimony, the State rested its case.

The defense called one witness – Osuna Veliz. He denied that the victim told him no, pushed him away, or prevented him from taking off the victim's clothes. He denied that the victim told him no or pushed him away when they began engaging in sexual intercourse. He further

testified that the victim "was moaning and making noises like she was totally enjoying it" and that she continued "kissing [him] back, in a very passionate way." Osuna Veliz also claimed that, when Taryn knocked on the bedroom door and asked if the victim was okay, the victim responded affirmatively. According to Osuna Veliz, the victim never told him no or made any noises to indicate that she was in pain. Osuna Veliz denied digitally penetrating the victim with his fingers, having penile-anal intercourse, ejaculating, or seeing blood on his penis.

## 2. VERDICT AND SENTENCING

The jury convicted Osuna Veliz of the charged offense and the matter was scheduled for a sentencing hearing. At the sentencing hearing, the court stated that it had considered the required factors including his age, employment, dependents, mentality, education, life experience, social and cultural background, and lack of criminal record. The court also considered the nature and motivation for the offense which the court stated, "was purely selfish . . . sexual gratification." The court also noted that the offense involved "significant violence towards the victim." Further, the court stated that it had read and considered the victim impact statements submitted by the victim and her parents.

The court found that imprisonment was necessary for the protection of the public, that the risk was substantial that Osuna Veliz would engage in additional criminal conduct during any period of probation, and that a lesser sentence would depreciate the seriousness of the offense and promote disrespect for the law. The district court sentenced Osuna Veliz to 18 to 20 years' imprisonment with credit for 383 days served. The sentence was ordered to be served consecutively to any other sentence currently being served by Osuna Veliz and he was required to register as a sex offender.

## III. ASSIGNMENTS OF ERROR

Osuna Veliz contends that (1) the district court erred in allowing improper expert testimony over trial counsel's objection; (2) the evidence was insufficient to support his conviction; (3) the sentence imposed is excessive; and (4) his trial counsel was ineffective in (a) failing to adequately advise him regarding plea negotiations; (b) failing to call Robert Kirkland as a witness at trial; (c) failing to adequately cross-examine the State's witness Lucas Harwood; and (d) failing to strike jurors who appeared to be pro-prosecution.

## IV. STANDARD OF REVIEW

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Osborne*, 313 Neb. 726, 986 N.W.2d 65 (2023).

A sentence imposed within the statutory limits will not be disturbed on appeal in the absence of an abuse of discretion by the trial court. *State v. Alkazahy*, 314 Neb. 406, 990 N.W.2d

740 (2023). Further, it is within the discretion of the trial court whether to impose probation or incarceration, and an appellate court will uphold the court's decision denying probation absent an abuse of discretion. *State v. Wills*, 285 Neb. 260, 826 N.W.2d 581 (2013); *State v. Montoya*, 29 Neb. App. 563, 957 N.W.2d 190 (2021).

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Anderson*, 305 Neb. 978, 943 N.W.2d 690 (2020).

In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id*.

## V. ANALYSIS

### 1. EVIDENTIARY RULING

Osuna Veliz' first assignment of error is that the district court erred in overruling his Neb. Rev. Stat. § 27-702 (Reissue 2016) objection to Boatright's testimony "that vagin[al] tearing occurs in 20 percent of all rape cases and tearing is a sign of rape." Osuna Veliz' brief does not cite to the portion of the bill of exceptions where these alleged errors occurred.

As the Nebraska Supreme Court noted in *Smith v. Colorado Organ Recovery Sys.*, 269 Neb. 578, 590, 694 N.W.2d 610, 622 (2005):

> It is not the function of an appellate court to scour the record looking for unidentified evidentiary errors. *In re Estate of Jeffrey B.,* 268 Neb. 761, 688 N.W.2d 135 (2004). Neb. Ct. R. of Prac. 9D(1)f and g (rev. 2001) requires that factual recitations be annotated to the record, whether they appear in the statement of facts or argument section of a brief. The failure to do so may result in an appellate court's overlooking a fact or otherwise treating the matter under review as if the represented fact does not exist. *First Westside Bank v. For–Med, Inc.,* 247 Neb. 641, 529 N.W.2d 66 (1995).

Despite this admonition, this court has reviewed the bill of exceptions. We first note that Osuna Veliz' characterization of Boatright's testimony as including the opinion that "tearing is a sign of rape" is an inaccurate description of Boatright's testimony. Boatright testified that tears can occur during consensual sex because "[a]ny time you . . . have that force where something gets caught and pulls, you're going to develop a tear. We don't usually see extensive injuries with consensual sex, but anytime . . . there is a sexual encounter you can absolutely have a tear."

Regarding Osuna Veliz' claim that the district court erred in allowing Boatright to testify "that vagin[al] tearing occurs in 20 percent of all rape cases," Boatright testified that:

> Along with just my own lived experience [with] SANE patient[s], I would say the research will tell you anywhere from 20 to 25 percent of the time you will have any sort of genital injury present at all. And I would say my lived experience would be that, if not even less.

> So, I would say less than 20 percent of the time in my lived experience have I seen any sort of genital injury related to a sexual assault. And that can be any level of injury. So, that could be one small injury.

There was no objection posed to this testimony. A litigant's failure to make a timely objection waives the right to assert prejudicial error on appeal. *State v. Johnson*, 314 Neb. 20, 988 N.W.2d 159 (2023). Although Osuna Veliz later posed a foundational objection to a question where Boatright was asked to compare the victim's injuries to the types of injuries seen in 20 percent of sexual assault cases, that particular ruling was not assigned as error. Since Osuna Veliz failed to pose an objection to the testimony which he alleges was erroneously admitted, this assignment of error fails.

## 2. INSUFFICIENCY OF EVIDENCE TO SUPPORT CONVICTION

Next, Osuna Veliz contends that the evidence was insufficient to support his conviction. He argues that the evidence was insufficient to find that sexual penetration occurred without the victim's consent because the victim kissed him, the victim told her friends that she had sex, and that the victim never told him that she did not want to have sex.

In this case, in order to convict Osuna Veliz of first degree sexual assault, the jury was required to find, beyond a reasonable doubt, that Osuna Veliz subjected the victim to sexual penetration without her consent. See Neb. Rev. Stat. § 28-319(1)(a) (Reissue 2016). Neb. Rev. Stat. § 28-318(6) (Cum. Supp. 2022) defines sexual penetration as

> sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical, nonhealth, or nonlaw enforcement purposes. Sexual penetration shall not require emission of semen[.]"

Section 28-318(8) defines "without consent" as follows:

> (a)(i) The victim was compelled to submit due to the use of force or threat of force or coercion, or (ii) the victim expressed a lack of consent through words, or (iii) the victim expressed a lack of consent through conduct, or (iv) the consent, if any was actually given, was the result of the actor's deception as to the identity of the actor or the nature or purpose of the act on the part of the actor;
>
> (b) The victim need only resist, either verbally or physically, so as to make the victim's refusal to consent genuine and real and so as to reasonably make known to the actor the victim's refusal to consent; and
>
> (c) A victim need not resist verbally or physically where it would be useless or futile to do so[.]

"[C]oercion'" in § 28-318(8)(a)(i) includes nonphysical force." *State v. McCurdy*, 301 Neb. 343, 358, 918 N.W.2d 292, 302 (2018).

The victim testified that Osuna Veliz penetrated her vagina and anus with his penis without her consent. Viewed in a light most favorable to the State, the victim's testimony is sufficient to support Osuna Veliz' conviction for first degree sexual assault. Further, there was evidence that the genital injuries sustained by the victim were significant, would have caused a great deal of pain to the victim, and were not consistent with consensual sex. Moreover, the discrepancies between Osuna Veliz' and the victim's testimony was a question for the jury and this court does not pass

on the credibility of witnesses when assessing the sufficiency of the evidence to support a conviction. Accordingly, we conclude the evidence was sufficient to support Osuna Veliz' conviction for first degree sexual assault.

### 3. EXCESSIVE SENTENCE

Next, Osuna Veliz contends that the sentence imposed was excessive. He contends that the district court failed to appropriately weigh sentencing factors including his lack of a criminal history, his strong history of employment, his low risk to reoffend, his willingness to participate in sex offender treatment, his familial support, and his need to support his 1½-year-old daughter. He also contends that a sentence of probation "would better fulfill [Osuna Veliz'] rehabilitative needs as [he has] no criminal history, and scored in the low risk range" to reoffend. Brief for appellant at 27.

Here, Osuna Veliz was convicted of first degree sexual assault, a Class II felony. See Neb. Rev. Stat. § 28-319 (Reissue 2016). Osuna Veliz' sentence of 18 to 20 years' imprisonment is within the statutory sentencing range for Class II felonies which have a minimum of 1 year of imprisonment and a maximum of 50 years' imprisonment. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2022).

When sentences imposed within statutory limits are alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering well-established factors and any applicable legal principles. *State v. Blake*, 310 Neb. 769, 969 N.W.2d 399 (2022).

And, as the Nebraska Supreme Court stated in *State v. Ezell*, 314 Neb. 825, 839-41, 933 N.W.2d 449, 460-61 (2023):

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors, as well as any applicable legal principles in determining the sentence to be imposed. When imposing a sentence, the sentencing court is to consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime.

While these factors should instruct a sentencing court, they do not comprise a mathematical formula that must be rigidly implemented. Rather, they are among the relevant factors that may be considered. A sentence should be tailored and based on factors that fit the offender and not merely the crime. The appropriateness of the sentence is necessarily a subjective judgment that includes the sentencing judge's observations of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

. . . .

It has long been recognized that sentencing is a matter that rests with the trial court. In reviewing a sentence, an appellate court does not employ its discretion; instead, it reviews the sentence for *abuse* by the trial court of *its* discretion. The Legislature has provided trial courts with significant discretion in sentencing, such as their discretion to

impose 1 to 50 years' imprisonment for Class II felonies and their discretion to order sentences to be served consecutively or concurrently. When a trial court exercises its discretion within the limits prescribed by law, that judgment cannot be controlled in the absence of an abuse of discretion.

(Emphasis in original.)

Here, the district court considered the required statutory factors in determining Osuna Veliz' sentence. Although the court noted that it considered several factors that were favorable to Osuna Veliz including his lack of a criminal history, his low risk of recidivism as indicated by several assessments contained in the PSR, his employment, his education, the support from his family, and the fact that he had a minor child, the court weighed more heavily the violence involved in the offense, the injuries and trauma caused to the victim, the motive for the offense which was Osuna Veliz' sexual gratification, the protection of the public, and that a lesser sentence would depreciate the seriousness of the offense and promote disrespect for the law. The sentence imposed by the district court, although necessarily a subjective determination, was not an abuse of discretion. The assignment of error is without merit.

4. INEFFECTIVE ASSISTANCE OF COUNSEL

Osuna Veliz' final assignment of error is that his trial counsel was ineffective in (a) failing to adequately advise him regarding plea negotiations; (b) failing to call Robert "RJ" Kirkland as a witness at trial; (c) failing to adequately cross-examine the State's witness Lucas Harwood; and (d) failing to strike jurors who appeared to be pro-prosecution.

Recently, in *State v. Allen*, 314 Neb. 663, 693-94, 992 N.W.2d 712, 734 (2023), *modified on denial of rehearing*, 315 Neb. 255, ___ N.W.2d ___, the Nebraska Supreme Court restated the standard for a claim of ineffective assistance of trial counsel made during a direct appeal:

> To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, [466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984),] the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.
>
> To show that counsel's performance was deficient, the defendant must show counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.
>
> In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.

### (a) Plea Negotiations

Osuna Veliz' first claim is that trial counsel was ineffective in failing to adequately advise him regarding plea negotiations. He contends that trial counsel did not inform him about plea offers and counsel did not attempt to get plea offers.

"As a general rule, defense counsel has the duty to communicate to the defendant all formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the defendant." *State v. Alfredson*, 287 Neb. 477, 485, 842 N.W.2d 815, 821-22 (2014).

Osuna Veliz and the State agree that the record is insufficient to address this claim on appeal. We agree that this claim cannot be resolved on direct appeal because it implicates matters outside of the record. See, *State v. Warner*, 312 Neb. 116, 977 N.W.2d 904 (2022) (holding claim of ineffective assistance of counsel cannot be resolved when claim arises about conversations with trial counsel where record is devoid of what occurred in those conversations); *State v. Hibler*, 302 Neb. 325, 923 N.W.2d 398 (2019); *State v. Wyrick*, 31 Neb. App. 815, 990 N.W.2d 65 (2023), *review denied* (July 17, 2023).

### (b) Failure to Call Witness

Next, Osuna Veliz assigns as error that trial counsel was ineffective in failing to call Kirkland as a witness at trial. He contends that "Kirkland walked into the room when the sexual act between [himself] and [the victim] was happening" and it was his belief that Kirkland would have so testified.

Here, the record showed that on September 7, 2022, during a recess on the second day of trial, trial counsel informed the court that he "had somebody looking for [Kirkland] for months" and it appeared they may have found his address and were "frantically" trying to subpoena him. Also on September 7, trial counsel filed a praecipe for subpoena requesting that Kirkland be required to appear and testify on a specified date and time. The district court granted that request and issued a subpoena that same day. On September 8, at the end of the third day of trial, trial counsel informed the court that he would find out if Kirkland had been served and update the court the following morning. The next day, September 9, a "Service Return" was filed with the district court indicating that Kirkland was not found at the address provided. As a result, Kirkland did not appear and was not called as a witness during Osuna Veliz' trial.

The evidence contained in the record shows that trial counsel had been attempting to locate Kirkland for months and attempted to have him subpoenaed to testify. The record shows that trial counsel expended significant efforts to locate and subpoena Kirkland but was ultimately unsuccessful. Counsel was not ineffective for failing to call Kirkland as a witness when, despite his efforts, Kirkland was unable to be located and served with a subpoena. We find that the record is sufficient to consider this claim on direct appeal and that the record refutes this claim. This allegation of ineffective assistance of trial counsel fails.

### (c) Failure to Adequately Cross-Examine

Osuna Veliz' third claim of trial counsel's ineffectiveness is counsel's failure to adequately cross-examine Lucas Harwood. The record reflects that Harwood was not called as a witness at trial. Since Harwood did not testify at trial, cross-examination of him was not possible. This claim of the ineffectiveness of trial counsel is refuted by the record.

(d) Failure to Strike Pro-Prosecution Jurors

The final claim by Osuna Veliz is that trial counsel was ineffective in failing to strike jurors who appeared to be pro-prosecution. His entire argument stated that Osuna Veliz "alleges that trial counsel did not dismiss two witness[es] [sic] [that he] believed to be pro prosecution. The record does not support that [Osuna Veliz] told trial counsel about seeking to remove these jurors, but if true this would be deficient." Brief for appellant at 23.

When the claim of ineffective assistance on direct appeal involves uncalled witnesses, vague assertions that counsel was deficient for failing to call "witnesses" are little more than placeholders and do not sufficiently preserve the claim. *State v. Blake*, 310 Neb. 769, 969 N.W.2d 399 (2022). However, the appellate court does not need specific factual allegations as to what the person or persons would have said, which will not be found in the appellate record. *Id.* It is sufficient that appellate counsel give on direct appeal the names or descriptions of any uncalled witnesses forming the basis of a claim of ineffective assistance of trial counsel. *Id.* Such specificity is necessary so that the postconviction court may later identify whether a particular claim of failing to investigate a witness is the same one that was raised on direct appeal. *Id.*

Although Osuna Veliz' claim involves jurors, not witnesses, his failure to identify or describe the jurors he claims that trial counsel was ineffective in failing to dismiss, results in the same deficiencies. His failure to identify or describe the jurors he claimed should have been dismissed is even more perplexing since voir dire was part of the record before this court. Similar to a claim that trial counsel should have called witnesses, Osuna Veliz' allegations that trial counsel should have dismissed pro-prosecution jurors, is a "placeholder" which does not provide sufficient specificity to preserve his claim.

## VI. CONCLUSION

Having considered and rejected all of Osuna Veliz' claims, except for his claim the trial counsel was ineffective for failing to inform him about plea offers or to negotiate for a plea agreement which is preserved for postconviction review, we affirm his conviction and sentence.

AFFIRMED.