Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/10/2023 09:06 AM CST

**State of Nebraska, appellee, v.
Tony W. Osborne, appellant.**

___ N.W.2d ___

Filed March 10, 2023.    No. S-22-225.

1. **Trial: Evidence.** Whether there is sufficient foundation evidence for the admission of physical evidence must necessarily be determined by the trial court on a case-by-case basis.

2. **Trial: Evidence: Appeal and Error.** A trial court's determination of the admissibility of physical evidence will not ordinarily be overturned except for an abuse of discretion.

3. **Convictions: Evidence: Appeal and Error.** Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.

4. **Criminal Law: Trial: Evidence.** Where objects pass through several hands before being produced in court, it is necessary to establish a complete chain of evidence, tracing the possession of the object or article to the final custodian; and if one link in the chain is missing, the object may not be introduced in evidence.

5. ____: ____: ____. Objects which relate to or explain the issues or form a part of a transaction are admissible in evidence only when duly identified and shown to be in substantially the same condition as at the time in issue. It must be shown to the satisfaction of the trial court that no substantial change has taken place in an exhibit so as to render it misleading.

6. **Evidence.** Important in determining the chain of custody are the nature of the evidence, the circumstances surrounding its preservation and custody, and the likelihood of intermeddlers tampering with the object.

7. **Controlled Substances.** Under the language of the criminal narcotics statutes, possession may be either actual or constructive.

8. **Words and Phrases.** Actual possession is synonymous with physical possession.

9. **Evidence: Proof: Intent.** Constructive possession may be proved by mere ownership, dominion, or control over contraband itself, coupled with the intent to exercise control over the same.

10. **Evidence: Proof.** Constructive possession may be proved by direct or circumstantial evidence and may be shown by the accused's proximity to the item at the time of the arrest or by a showing of dominion over it.

11. **Controlled Substances.** Possession of a controlled substance means either (1) knowingly having it on one's person or (2) knowing of the substance's presence and having control over the substance.

12. **Evidence: Proof.** Mere presence at a place where the item in question is found is not sufficient to show constructive possession.

13. **Controlled Substances: Motor Vehicles: Evidence.** Possession of an illegal substance can be inferred from a vehicle passenger's proximity to the substance or other circumstantial evidence that affirmatively links the passenger to the substance.

14. **Controlled Substances: Evidence: Proof.** Evidence that a defendant had constructive possession of a drug with knowledge of its presence and its character as a controlled substance is sufficient to support a finding of possession and to sustain a conviction for unlawful possession.

Appeal from the District Court for Otoe County: Julie D. Smith, Judge. Affirmed.

Keith M. Kollasch, of Kollasch Law Office, for appellant.

Douglas J. Peterson, Attorney General, and Jordan Osborne for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Miller-Lerman, J.
## NATURE OF CASE
Tony W. Osborne appeals his convictions in the district court for Otoe County for possession of a controlled substance

with intent to deliver and for possession of a controlled substance without a tax stamp. Osborne claims that the district court erred when it overruled his motion in limine and admitted evidence, over objection at trial, including the controlled substance that had been in the possession and under the control of a Nebraska State Patrol evidence technician who was later indicted for theft of controlled substances under her control. Osborne also claims that there was not sufficient evidence to support his convictions because the State failed to show that the controlled substance was in his physical or constructive possession. We affirm Osborne's convictions.

STATEMENT OF FACTS

On March 2, 2021, Nebraska State Patrol Trooper Ashdonn Nolte observed a traffic violation and initiated a stop of a red Chevy Suburban. There were three occupants in the vehicle. The driver was later identified as Wally Sellers, and the person in the front passenger seat was later identified as Natasha Borrego. Osborne was seated in the rear seat on the passenger side.

Sellers initially gave Nolte a false name, but he was later identified by use of a fingerprint device, and it was discovered that he had outstanding warrants. After some resistance by Sellers, Nolte placed Sellers under arrest based on the warrants.

Additional law enforcement officers, including Nebraska State Patrol Trooper Jamieson Brown and Otoe County Deputy William Bushhousen, arrived to assist with the traffic stop. Nolte had determined that neither Borrego nor Osborne had a valid driver's license, and he called for a tow truck. While Nolte was processing the arrest of Sellers, Bushhousen asked Borrego and Osborne to get out of the Suburban. Borrego got out on the front passenger side and turned to collect her personal items from inside the Suburban. As Osborne started getting out on the rear passenger side and Borrego continued to retrieve her personal items, Bushhousen saw a black

sock falling and hitting the ground. Bushhousen picked up the sock and saw that inside of it there were multiple plastic baggies of a substance he thought to be methamphetamine. Bushhousen handed the sock to Brown, who opened the sock and observed multiple baggies containing what he also thought to be methamphetamine. A field test completed by another trooper and observed by Brown yielded a result that was positive for methamphetamine.

Both Borrego and Osborne denied ownership of the sock and its contents, and Sellers also denied ownership. All three were arrested and taken to the Otoe County jail on charges of possession of methamphetamine. During searches at the jail, Sellers and Borrego were both found to have methamphetamine on their persons. Sellers had a crystal substance in his pocket, and Borrego admitted that she had hidden a baggie of methamphetamine inside her vagina. No methamphetamine was found on Osborne's person during the traffic stop or during a search at the jail.

Bushhousen initially thought that the sock had fallen from Borrego's person or her area of the vehicle because it landed near her. However, after viewing video from his body camera, Bushhousen determined that the sock had fallen from the rear passenger side as Osborne was getting out of the vehicle. The video was viewed by the district court and is included in the record on appeal. Other evidence, some of which is discussed later herein, led investigators to believe that the sock and its contents had been in the possession of Osborne. The State filed an information charging Osborne with possession of a controlled substance with intent to deliver and possession of a controlled substance without a tax stamp. The State also charged Osborne with being a habitual criminal.

Prior to Osborne's trial, Osborne's attorneys learned that Anna Idigima, a former employee of the Nebraska State Patrol whose duties included having custody of evidence submitted for forensic testing, had been charged with crimes involving evidence being held at the State Patrol evidence locker.

Idigima had been indicted in federal court on charges of conspiracy to distribute and possession with intent to distribute controlled substances.

On December 9, 2021, Osborne filed a motion in limine in which he sought an order preventing the State from seeking admission of any evidence that had been under the control of Idigima. Osborne alleged that Idigima had received evidence related to his case on March 3, 2022, and that it was under her control and custody prior to its transfer to the Nebraska State Patrol Crime Laboratory (crime lab) on March 10. Osborne alleged that it was his understanding that Idigima either would not appear as a witness in this case or would invoke her Fifth Amendment rights if questioned about evidence that had been under her control. Osborne alleged that without testimony by Idigima, the State would be unable to prove the complete chain of custody for the evidence.

The district court held a hearing on Osborne's motion in limine on December 20, 2021. The State presented testimony by four witnesses. The first witness was Brown, the trooper who had participated in the traffic stop on March 2. Brown testified that after the traffic stop was concluded, he took the evidence, including the sock and the methamphetamine contained inside, to the State Patrol office in Nebraska City, Nebraska. At that office, Brown weighed the methamphetamine and then put it and the sock into an evidence bag which he then sealed and initialed. Brown identified exhibit 5 as being the evidence bag containing the sock and the methamphetamine. He testified that the seal on the evidence bag appeared at the hearing to be in the same condition as when he had placed it there. Brown testified that there were two new markings on the bag, one from the evidence room and one from the crime lab, as well as a new seal. He testified that the items inside the evidence bag appeared to be in the same condition as when he first collected them at the traffic stop.

The State's next witness was Tiffanie Leffler, who was the evidence supervisor at the crime lab. Leffler testified that

one of her duties was to maintain the chain of custody for evidence at the crime lab. She testified generally about procedures she follows to perform that duty. Leffler also testified regarding security measures employed at the crime lab. Leffler testified that on March 10, 2021, she received evidence in Osborne's case from Idigima. She identified exhibit 5 as being part of the evidence that she received on that date.

Leffler testified that in accordance with her procedure, she examined the evidence bag to ensure that the seal was intact and initialed and that there were no rips or tears or opened areas on the bag. She testified that she noted no issues with the evidence bag. Leffler testified that upon examining exhibit 5 at the hearing, the only difference from when she first received the evidence bag was that a new seal had been placed by the analyst after testing the contents. Leffler testified that because the original seal initialed by the law enforcement officer and the new seal placed by the analyst were the only two seals on exhibit 5, it indicated that there were no other times that the contents of the evidence bag had been touched since they were originally put into the bag. Leffler testified that she did not think it was possible that exhibit 5 could have been altered or opened prior to when she received it because there would have been some indication on the bag that it had been opened.

The State's next witness at the hearing on the motion in limine was Jerry Smith, who was a supervisor and technical lead for the drug chemistry section at the crime lab. Smith identified exhibit 5 as being evidence that he had tested. He testified that the evidence bag was sealed when he received it and that he did not observe any indication that it had been opened since it was sealed. Smith testified that the substance tested positive for methamphetamine and that the total weight of the substance was 24.211 grams, which he testified was a negligible difference from the weight of 24.1 grams that Brown had measured when he collected the evidence. Smith testified that after he completed testing, he resealed the evidence

bag and returned it to Leffler. He testified that at the time of the hearing, exhibit 5 was in essentially the same condition as it was when he first received it and the only addition was a seal he had placed and initialed after he had completed testing and resealed the bag.

The State's final witness at the hearing on the motion in limine was Kaleb Bruggeman, a lieutenant with the Nebraska State Patrol. Bruggeman testified that he was involved in the investigation of Idigima and her handling of evidence at the State Patrol evidence locker. Bruggemen testified that the investigation indicated that Idigima had removed controlled substances from the evidence locker and that she and a federal codefendant intended to distribute the controlled substances. He testified that the evidence showed that Idigima had taken evidence but did not show that she had altered evidence or transferred evidence from one case to another.

Bruggeman testified regarding procedures for maintaining chain of custody; having reviewed the chain of custody report for exhibit 5, Bruggeman testified that the report indicated that on the morning of March 3, 2021, Idigima had taken the sealed evidence bag from the evidence locker where it had been left by the law enforcement officer, placed a barcode on the evidence bag, and placed the evidence bag in a permanent location in the storage room. Bruggeman also testified that the report indicated that on March 10, Idigima had taken exhibit 5 to the crime lab. Bruggeman testified that the report indicated that Idigima did not have any contact with exhibit 5 after she transported it to the crime lab and that exhibit 5 remained at the crime lab until Bruggeman himself retrieved it from the crime lab.

Bruggeman testified that as part of the investigation of Idigima, Lincoln Police Department officers examined evidence that had been under the control of Idigima. Bruggeman observed the officers' examination of exhibit 5, which examination revealed no signs of tampering. Bruggeman testified

that based on his investigation, he believed that it was in or after June 2021 that Idigima began taking items of evidence.

Osborne did not offer testimony at the hearing, but he argued in part that the State could not establish a chain of custody for exhibit 5 without testimony by Idigima or an opportunity for Osborne to cross-examine her. At the close of the hearing, the court ruled from the bench. The court stated that proof that an exhibit remained in the custody of law enforcement officials was sufficient to prove a chain of custody and was sufficient foundation to permit its introduction into evidence.

As reflected in the record, the court considered evidence presented at the hearing regarding the nature of the evidence at issue, the circumstances surrounding its custody, and the likelihood of intermeddlers tampering with the evidence. The court noted that the evidence bag was sealed by Brown after he put the evidence inside and that it was still sealed when Smith received it to test the substance inside. The court noted no evidence that anyone had observed anything that would indicate tampering with the evidence. The court further noted that the dates on which Idigima had access to the evidence predated the dates of the offenses for which Idigima was charged and that such charges related to taking evidence and not to tampering with evidence by adding evidence or moving evidence between cases. The court stated there was no evidence of tampering with the specific evidence in this case. Based upon these considerations, the court found that it was not likely that any intermeddler, including Idigima, had tampered with the evidence in this case. The court therefore overruled Osborne's motion in limine.

Osborne waived his right to a jury trial, and a bench trial was held. Evidence presented by the State included, inter alia, testimony by the law enforcement officers who participated in the traffic stop, including Nolte, Brown, and Bushhousen. Videos from the body cameras worn by each of the officers during the traffic stop were also received into evidence.

Stills from the video of Bushhousen's body camera were also received into evidence, and such stills generally depicted the time when Borrego was gathering her items from the front passenger compartment of the Suburban, Osborne was beginning to get out on the rear passenger side of the vehicle, and the sock was falling from the vehicle.

In connection with the admission of the stills from the video of his body camera, Bushhousen testified that although at the time of the traffic stop he thought the sock had come from Borrego's area of the vehicle, after reviewing the trajectory of the sock as reflected in the video from his body camera, he determined that the sock had come from the area where Osborne was seated. Bushhousen also testified that the video showed that prior to getting out of the vehicle, Osborne could be seen leaning forward toward the floorboard or under the front seat several times.

At trial, the State also presented testimony by Brown, Leffler, and Smith regarding the chain of custody for exhibit 5. Their testimony at the bench trial was consistent with their testimony at the hearing on Osborne's motion in limine recited above. During Smith's testimony, which followed that of Brown and Leffler, the State offered exhibit 5 into evidence. The court received exhibit 5 over Osborne's objections based on chain of custody and foundation.

Anthony Frederick, an investigator with the Nebraska State Patrol, testified regarding his investigation of this case after the traffic stop. On March 3, 2021, the day after the traffic stop, Frederick interviewed Sellers, Borrego, and Osborne. Based on information from those interviews, Frederick went to a gas station in Lincoln, Nebraska, and obtained surveillance video of the night of March 2 from that location. The surveillance video was received into evidence without objection.

Frederick testified that the relevant part of the surveillance video showed that a Suburban pulled up to a red car that was parked in a lot near the gas station. The surveillance video

depicted a person getting out of the back seat of the Suburban and getting into the back seat of the red car. The person stayed inside the red car for a short time before getting out and returning to the back seat of the Suburban. Both vehicles then left the parking lot. Frederick identified Osborne as the person depicted in the video as getting out of the Suburban, getting into the red car, and then returning to the Suburban. Frederick testified that through further investigation, he identified Daniel Zeiger as being in the red car. Frederick testified that based on his training and experience, he believed that the surveillance video depicted a drug transaction.

Zeiger was called by the State as a witness. He testified that he was in custody on drug-related charges and that as part of his case, he had agreed to give testimony in other cases, including Osborne's. Zeiger testified that he knew Osborne through Osborne's brothers, who were friends of Zeiger. Zeiger testified that he met Osborne in a parking lot near a gas station and had delivered 7 grams of methamphetamine to Osborne. Zeiger was shown the surveillance video from the gas station that had been entered into evidence during Frederick's testimony. Zeiger testified that the surveillance video depicted the transaction between himself and Osborne. Zeiger also testified that he had delivered an additional 7 grams of methamphetamine to Osborne earlier that same day.

The State's final witness in the bench trial was Borrego. She testified that on March 2, 2021, she and Sellers drove from Nebraska City to Lincoln in a red Suburban with the purpose of buying methamphetamine from a friend of hers. The friend was at the residence where Osborne lived. Borrego bought 3.5 grams of methamphetamine from her friend. While Borrego and Sellers were at the residence, Osborne asked if they would give him a ride to Nebraska City, to which they agreed.

In the red Suburban, Borrego sat in the front passenger seat and Osborne was in the rear passenger seat. On the way out of Lincoln, they stopped at one gas station to get gas, and then they stopped at a second gas station where Osborne

"was meeting somebody." Osborne got out of the Suburban, got into another car, and then returned to the Suburban. After they left the second gas station, Osborne asked Sellers and Borrego whether they "were good," which Borrego understood to mean whether they had some methamphetamine; they replied that they "had a little bit," and Osborne said that "he would hook [them] up for the ride."

Borrego testified that during the traffic stop when she was getting out of the Suburban, she did not retrieve a sock containing methamphetamine from the vehicle, and that she was not aware there was a sock containing methamphetamine in the vehicle. She testified that when the officer presented the sock to her, she did not recognize it. Borrego testified that when she had methamphetamine, she generally carried it inside her vagina, and that the only methamphetamine she had inside the Suburban that night was that which she had obtained earlier that day and that was on her person. On cross-examination, Borrego testified that she had originally been charged with felony possession with intent to deliver but that pursuant to a plea agreement, she had pled guilty to misdemeanor attempted possession.

Osborne called two witnesses in his defense—Sellers and Zeiger. Sellers testified that Borrego was his girlfriend, that they had traveled to Lincoln from Nebraska City, and that they gave Osborne a ride on the trip back. Sellers testified that he had been charged with felony possession with intent to deliver but that pursuant to a plea agreement, he pled guilty to misdemeanor attempted possession. Osborne called Zeiger as a witness and reminded Zeiger of his prior testimony regarding the amount of methamphetamine he had delivered to Osborne. Upon questioning, Zeiger testified that he generally weighed methamphetamine before he delivered it and that his weights were accurate.

After Osborne rested and both sides had presented closing arguments, the court announced its findings from the bench. The court stated that it generally found the witnesses

to be credible "with the possible exception of . . . Sellers," and the court specifically noted testimony by Borrego and Zeiger. The court also found that the stills from the video taken on Bushhousen's body camera "show[] the sock falling from the vehicle and not falling from . . . Borrego" and that it "appear[ed] that it was swept out of the vehicle by [Osborne's] foot." The court further noted that the methamphetamine appeared to be packaged for sale and was in a quantity in excess of 20 grams. The court found Osborne guilty of both possession of a controlled substance with intent to deliver and possession of a controlled substance without a tax stamp.

The court thereafter found Osborne to be a habitual criminal. The court sentenced Osborne to imprisonment for 10 to 30 years for each conviction, and it ordered that the sentences be served concurrent to one another.

Osborne appeals his convictions.

## ASSIGNMENTS OF ERROR

Osborne claims, restated, that the district court erred when it overruled his motion in limine and over objection at trial admitted evidence that had been in the possession and under the control of Idigima. Osborne also claims that there was not sufficient evidence to support his convictions because the State failed to show that the controlled substance was in his physical or constructive possession.

## STANDARDS OF REVIEW

[1,2] Whether there is sufficient foundation evidence for the admission of physical evidence must necessarily be determined by the trial court on a case-by-case basis. *State v. Blair*, 300 Neb. 372, 914 N.W.2d 428 (2018). A trial court's determination of the admissibility of physical evidence will not ordinarily be overturned except for an abuse of discretion. *Id*.

[3] Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether

the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Pauly*, 311 Neb. 418, 972 N.W.2d 907 (2022).

ANALYSIS

*There Was Sufficient Evidence to Establish*
*Foundation for Admission of Exhibit 5,*
*the Evidence Bag Containing the*
*Sock and Methamphetamine.*

Osborne's first assignment of error concerns the admission of exhibit 5, the evidence bag containing the sock and methamphetamine, which at one point had been under Idigima's control. Osborne claims that the district court erred when it overruled his motion in limine and over objection admitted such evidence at trial. Osborne argues that without testimony by Idigima, the State could not establish the chain of custody for evidence that had been in her possession and therefore could not show foundation to admit such evidence. We conclude that the State provided sufficient foundation and that the district court did not abuse its discretion when it determined that the evidence was admissible.

[4-6] Where objects pass through several hands before being produced in court, it is necessary to establish a complete chain of evidence, tracing the possession of the object or article to the final custodian; and if one link in the chain is missing, the object may not be introduced in evidence. *State v. Weathers*, 304 Neb. 402, 935 N.W.2d 185 (2019). Objects which relate to or explain the issues or form a part of a transaction are admissible in evidence only when duly identified and shown

to be in substantially the same condition as at the time in issue. *Id*. It must be shown to the satisfaction of the trial court that no substantial change has taken place in an exhibit so as to render it misleading. *Id*. Important in determining the chain of custody are the nature of the evidence, the circumstances surrounding its preservation and custody, and the likelihood of intermeddlers tampering with the object. *Id*. Whether there is sufficient foundation to admit physical evidence is determined on a case-by-case basis. *Id*.

Osborne generally argues that without testimony by Idigima, one link in the chain of custody for exhibit 5 was missing, and that therefore, the State could not establish foundation for admitting it into evidence. However, our precedent does not require that every person who has played a role in the chain of custody must testify. Instead, the focus is on whether the complete chain of custody has been established and whether it has been shown to the satisfaction of the court that the object is in substantially the same condition as it was at the relevant time and that no substantial change has taken place in the evidence so as to render it misleading.

For example, in *State v. Weathers, supra*, we concluded that testimony by a doctor who supervised the collection of evidence by a nurse was sufficient to establish the chain of custody, even though the doctor did not personally handle all of the steps in securing the evidence but did testify regarding steps performed by a nurse under the doctor's supervision. We determined that the doctor's testimony regarding the procedures which were followed, when combined with other evidence such as testimony by police officers who collected, packaged, and sealed the evidence, was sufficient to establish a chain of custody. We noted that the defendant in *Weathers* did not cite "authority requiring that the specific person who physically collected and sealed the samples must testify," and we concluded that testimony by the doctor who supervised the examination was sufficient to establish that step in the chain. 304 Neb. at 428, 935 N.W.2d at 205.

Similarly, in the present case, we do not think the absence of testimony by Idigima was fatal to establishing the chain of custody. The State presented testimony by other witnesses who could establish the chain of custody from collection of the evidence until the time of trial and who could establish that it was in substantially the same condition as when it was collected and that no material change had occurred which would make the evidence misleading. Those witnesses included Brown, who collected the sock and its contents at the scene, put it into the evidence bag, and sealed the bag; Leffler, who received the evidence bag at the crime lab; and Smith, who tested the substance. Each witness testified that at the time of trial, the evidence was in substantially the same condition as when each of them had custody of it. The discrepancies noted by these witnesses, such as a seal Smith added when testing was completed, were explained by the testimony of the other witnesses. Significantly, with respect to Osborne's argument that Idigima might have tampered with the evidence, we note that Leffler, who was the first witness in the chain to have custody after Idigima, testified that when she received the evidence bag, she examined it and confirmed that the seal placed by Brown was intact and there were no signs of tampering. Smith similarly testified that when he received the evidence bag, he did not observe any indication that it had been opened since it was sealed by Brown. The testimony by the State's witnesses showed a complete chain of custody for exhibit 5. Such testimony further showed that exhibit 5 was in substantially the same condition as it was when Brown collected the sock and its contents and placed them in the evidence bag and that no substantial change had taken place in the evidence which would render it misleading.

We conclude that the evidence in this case was sufficient to establish the chain of custody and to provide foundation for the admission of exhibit 5 and that the district court did not abuse is discretion when it determined exhibit 5 was admissible. We therefore reject Osborne's first assignment of error.

*There Was Sufficient Evidence to Show That*
*Osborne Possessed the Methamphetamine*
*and to Support Osborne's Convictions.*

Osborne also claims that there was not sufficient evidence to support his convictions because the State failed to show that the controlled substance was in his physical or constructive possession. We conclude that the evidence was sufficient to show possession and to support the convictions.

Osborne was convicted of possession of a controlled substance, methamphetamine, with intent to deliver under Neb. Rev. Stat. § 28-416(1)(a) (Cum. Supp. 2020) and of possession of a controlled substance without a tax stamp under Neb. Rev. Stat. § 77-4309 (Reissue 2018). Both convictions require, among other elements, that the defendant possessed a controlled substance. Osborne contends that the State's evidence was not sufficient to prove that he was in possession of the methamphetamine that was found inside the sock. Osborne does not argue the sufficiency of the evidence with regard to the other elements of either offense, and so our analysis focuses solely on whether there was sufficient evidence of Osborne's possession of the methamphetamine.

In reviewing a criminal conviction, we do not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Pauly*, 311 Neb. 418, 972 N.W.2d 907 (2022).

[7-14] We have held that under the language of the criminal narcotics statutes, possession may be either actual or constructive. *State v. Warlick*, 308 Neb. 656, 956 N.W.2d 269 (2021). Actual possession is synonymous with physical possession. *Id*. Constructive possession, in contrast, may be proved by mere ownership, dominion, or control over contraband itself, coupled with the intent to exercise control over the same. *Id*. Constructive possession may be proved by direct

or circumstantial evidence and may be shown by the accused's proximity to the item at the time of the arrest or by a showing of dominion over it. *Id*. Thus, possession of a controlled substance means either (1) knowingly having it on one's person or (2) knowing of the substance's presence and having control over the substance. *Id*. Mere presence at a place where the item in question is found is not sufficient to show constructive possession. *Id*. But possession of an illegal substance can be inferred from a vehicle passenger's proximity to the substance or other circumstantial evidence that affirmatively links the passenger to the substance. *Id*. Evidence that a defendant had constructive possession of a drug with knowledge of its presence and its character as a controlled substance is sufficient to support a finding of possession and to sustain a conviction for unlawful possession. *Id*.

In the present case, there was no direct evidence that Osborne was in physical possession of the methamphetamine. It was not found on his person, and instead, it was found in a sock on the ground outside the vehicle as Osborne was getting out of the vehicle. However, in this bench trial, the district court cited specific evidence that supported its finding that Osborne possessed the methamphetamine. The court stated that it found that the stills from the video of Bushhousen's body camera showed that the sock containing the methamphetamine fell from the vehicle and not from Borrego's person and that instead, it appeared to have been swept out of the vehicle by Osborne's foot as he was getting out of the vehicle. Our viewing of the video from Bushhousen's body camera and of the stills from the video indicate that it was reasonable for the finder of fact to find that the video shows that the sock fell from the area of the vehicle where Osborne was seated and that Osborne appeared to kick the sock out of the vehicle, whether intentionally or accidentally, as he got out of the vehicle. Based on this evidence, Osborne's possession of the sock and its contents could be inferred from its physical proximity to him when it was inside the vehicle.

But mere proximity was not the only evidence from which it could be inferred that Osborne possessed the methamphetamine that was inside the sock; other circumstantial evidence affirmatively linked Osborne to the substance. Zeiger testified that at two times on the day of the traffic stop, he had distributed methamphetamine to Osborne. The second time occurred shortly before the traffic stop. The methamphetamine inside the sock was contained in multiple baggies, and the amount of methamphetamine was such that it could be reasonably inferred that the methamphetamine inside the sock included the methamphetamine Zeiger provided to Osborne earlier in the day, as well as methamphetamine from another source or sources. In addition, Borrego testified that after they had stopped at the gas station where Zeiger testified he had provided methamphetamine to Osborne, Osborne made a comment to her and Sellers that she understood to mean that Osborne could provide them with some methamphetamine if they wanted it. We note that the district court specifically stated that it found testimony by Zeiger and by Borrego to be credible, and the testimony set forth above provided circumstantial evidence from which the court as finder of fact could find that Osborne possessed the methamphetamine found inside the sock.

Based on evidence of the proximity of the sock to Osborne when it was inside and then falling from the vehicle and other circumstantial evidence that Osborne was in possession of methamphetamine at the time of the traffic stop, we determine there was sufficient evidence from which the district court could find that Osborne possessed the methamphetamine that was inside the sock. Because there was sufficient evidence that Osborne possessed the methamphetamine, and because Osborne does not challenge the sufficiency of the evidence of the other elements of each offense, we conclude that there was sufficient evidence to support Osborne's convictions. We reject this assignment of error.

## CONCLUSION

We conclude that there was sufficient evidence to establish the chain of custody and provide foundation for admission of exhibit 5 and that therefore, the district court did not abuse its discretion when it found the evidence admissible. We further conclude that there was sufficient evidence of Osborne's possession of the methamphetamine to support his convictions. We therefore reject Osborne's assignments of error, and we affirm Osborne's convictions.

Affirmed.