IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. RUDLOFF

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

SHAWN S. RUDLOFF, APPELLANT.

Filed April 28, 2026.    No. A-25-313.

Appeal from the District Court for Sioux County: TRAVIS P. O'GORMAN, Judge. Affirmed.

Bell Island, of Island Law Office, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Nathan A. Liss for appellee.

RIEDMANN, Chief Judge, and BISHOP and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Shawn S. Rudloff appeals from the Sioux County District Court's order affirming his county court conviction of driving under the influence (DUI), second offense. He argues that the district court erred in affirming the county court's order that admitted certain test results, denied his motion to suppress, and denied his motion for a directed verdict. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

### 1. BACKGROUND

On August 20, 2021, Deputy Mandy Murphy and Deputy Garrett Naillon were patrolling together in Harrison, Nebraska. At approximately 9:49 p.m., Deputy Murphy observed a green and white 1967 Chevy pickup truck making a U-turn and noticed that the vehicle's driver's side taillight was inoperable and the vehicle did not have a rear license plate. She also observed beer

- 1 -

cans in the roadway but could not see anyone throwing them out of the vehicle. Deputy Murphy activated her emergency lights and stopped the pickup. The driver, later identified as Rudloff, got out of the pickup. She instructed Rudloff to return to the pickup and Rudloff complied. While standing approximately 2 or 3 feet from Rudloff, near the driver's door of the pickup, she smelled a "very strong" odor of alcohol coming from Rudloff's person; and observed that his speech was slurred; that he had blood shot/watery eyes; and that while Rudloff was out of the vehicle, he was not walking straight and was "kind of stumbling." When Deputy Murphy asked Rudloff if he had been drinking, Rudloff responded that he had "a couple" beers and that he "was buzzed." Based upon her observations, Deputy Murphy detained Rudloff to conduct a DUI investigation.

Deputy Murphy administered the Horizontal Gaze Nystagmus (HGN) test, together with a nine-step walk and turn, and one-leg stand field sobriety tests. Rudloff showed six out of six clues of impairment on the HGN, failed the nine-step walk and turn, and was unable to complete the one-leg stand test. Deputy Murphy, believing Rudloff was under the influence of alcohol, requested that Rudloff submit to a Preliminary Breath Test (PBT) and Rudloff complied. After receiving Rudloff's result on the PBT, which was .185, Deputy Murphy arrested Rudloff for driving under the influence of alcohol.

After issuing a Post-Arrest Chemical Test Advisement to Rudloff, Rudloff signed a form and consented to a chemical test of his blood to determine his blood alcohol concentration. Deputy Murphy transported Rudloff to a medical center to undergo the blood test and observed Rudloff from the time he exited the patrol car through the time he was getting his blood drawn. Deputy Murphy provided the phlebotomist with a blood test kit supplied by the Nebraska Department of Health and Human Services (DHHS). After the phlebotomist completed the blood draw, the blood samples were placed back in the kit, paperwork was completed, and the kit was sealed and placed into an evidence locker. The kit was subsequently mailed to the Nebraska Public Health Environmental Laboratory, where a forensic scientist completed an analysis of Rudloff's blood sample utilizing a single-column gas chromatography method of analysis. The analysis determined that Rudloff's blood showed .176 grams of ethanol per 100 milliliters of blood. Thereafter, the State charged Rudloff with second offense DUI.

## 2. PRETRIAL MOTIONS

Rudloff filed a motion to suppress requesting that the court prohibit the State from introducing evidence obtained from law enforcement's search, seizure, and arrest, which Rudloff asserted violated his Fourth Amendment rights under the U.S. Constitution and the Nebraska Constitution. Rudloff also made an oral motion to exclude his blood test results. The county court overruled both motions.

## 3. JURY TRIAL AND VERDICT

A jury trial was held in August 2024. The State adduced testimony consistent with the facts above from Deputy Murphy; Alicia Dickey, a phlebotomist; Paul Hofmeister, general counsel for Regional West Medical Center; Sheriff Chad McCumbers; Dr. Erienne TeSelle, a DHHS Public Health Environmental Laboratory forensic scientist; and Henry Nipper, a forensic toxicology expert. Following the State's case-in-chief, Rudloff filed a motion for directed verdict. After that motion was overruled, Rudloff adduced testimony from Kevin Schugg, a forensic toxicology

expert, and Deputy Naillon. At the close of the evidence, Rudloff renewed his motion for directed verdict, which was overruled by the county court.

The jury subsequently returned a guilty verdict and, following an enhancement hearing, the county court sentenced Rudloff to 30 days in jail, a $500 fine, revoked Rudloff's driver's license for 18 months, and ordered Rudloff to apply for an ignition interlock permit and install an ignition interlock device on any motor vehicle Rudloff operated after a required 45-day no driving period.

### 4. APPEAL TO DISTRICT COURT

In November 2024, Rudloff appealed his conviction and sentence to the district court, assigning as error that the county court erred in denying his motion to suppress, denying his motion for independent testing, "admitting evidence at trial," and "overruling the objection to evidence at trial." Rudloff filed an amended assignment of errors in February 2025, asserting that the county court erred in admitting Rudloff's blood test, overruling his motion to suppress, admitting the HGN test, denying his request for an independent test, and overruling his motion for a directed verdict. The district court affirmed Rudloff's conviction and sentence finding that the motion to suppress was properly denied, that the blood test and the HGN test were properly admitted, and that the county court properly denied Rudloff's request for independent testing and motion for a directed verdict.

Rudloff has now appealed from the district court's order affirming his conviction and sentence in the county court.

## III. ASSIGNMENTS OF ERROR

Rudloff assigns that the district court erred in affirming the county court's (1) admission of the blood test, (2) denial of his motion to suppress, (3) admission of the HGN test, and (4) denial of his motion for a directed verdict.

## IV. STANDARD OF REVIEW

Both the district court and a higher appellate court generally review appeals from the county court for error appearing on the record. *State v. Jennings*, 308 Neb. 835, 957 N.W.2d 143 (2021). Under that standard, an appellate court's inquiry is whether the trial court's decision conformed to the law, was supported by competent evidence, and was neither arbitrary, capricious, nor unreasonable. *Id.* So, in appeals from the district court sitting as an appellate court, the immediate question is whether the district court erred in its appellate review of the county court's decision, but review of that question necessarily involves considering the decision of the county court. *Id.*

## V. ANALYSIS

### 1. ADMISSION OF BLOOD TEST

Rudloff first assigns that the district court erred in affirming the county court's admission of the blood test, where the test was not conducted in a scientific manner in violation of Neb. Evid. R. 702; the test failed to comply with the regulations governing a blood test under 177 Neb. Admin. Code, ch. 1 (2016); and the State failed to establish the chain of custody when the blood vials or

photocopies of the vials were not admitted into evidence. We address each of those arguments separately.

(a) Methodology

As it relates to Rudloff's argument that the district court erred in admitting the blood test results because the test was not conducted in a scientific manner, Rudloff more specifically asserts that the State's use of a single column gas chromatography test of his blood sample was not a scientifically proven methodology under Rule 702.

In *Hemsley v. Langdon*, 299 Neb. 464, 473, 909 N.W.2d 59, 67-68 (2018), the Nebraska Supreme Court, in addressing the framework for the admissibility of expert testimony, stated:

> In *Schafersman v. Agland Coop*, [262 Neb. 215, 631 N.W.2d 862 (2001)], we adopted the framework set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, [509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed 2d 469 (1993),] and its progeny, *Kumho Tire Co. v. Carmichael*[, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed 2d 238 (1999),] and *General Electric Co. v. Joiner*[, 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed 2d 508 (1997)]. Under the *Daubert/Schafersman* framework, the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion. This entails a preliminary assessment whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue. The *Daubert/Schafersman* standards require proof of the scientific validity of principles and methodology utilized by an expert in arriving at an opinion in order to establish the evidentiary relevance and reliability of that opinion. The purpose of this gatekeeping function is "'to ensure that the courtroom door remains closed to "junk science" that might unduly influence the jury, while admitting reliable expert testimony that will assist the trier of fact.'"

An appellate court reviews the record de novo to determine whether a trial court has abdicated its *Schafersman* gatekeeping function. *Hemsley v. Langdon, supra.* When the trial court has not abdicated its *Schafersman* gatekeeping function, an appellate court reviews the trial court's decision to admit or exclude the evidence for an abuse of discretion. *Id*.

In this case, Dr. TeSelle testified that she had a Class A permit and was licensed to complete blood analysis tests using the gas chromatography method. Dr. TeSelle testified that she tested Rudloff's sample on August 26, 2021, and followed DHHS rules and regulations under 177 Neb. Admin. Code, ch. 1, when completing the analysis. At the time that she performed the analysis of Rudloff's sample in August 2021, the laboratory analyzed blood samples utilizing the single-column gas chromatography method, but in January 2022, the laboratory began analyzing samples utilizing dual-column chromatography. Dr. TeSelle testified that, even when utilizing the single-column method, the laboratory included a known quality control sample to ensure that the results were accurate. She further testified that the laboratory undergoes routine proficiency testing from the College of American Pathologists as part of renewing their Class A permit, wherein they receive a number of unknown samples, analyze them, and send the results back. The results are then evaluated, and the laboratory is given a passing or failing grade.

The drawing of blood and the admissibility of test results are controlled by Neb. Rev. Stat. § 60-6,201 (Reissue 2021). *State v. Trampe*, 12 Neb. App. 139, 668 N.W.2d 281 (2003). To be considered valid, tests of blood, breath, or urine made under Neb. Rev. Stat. § 60-6,197 (Reissue 2021) or tests of blood or breath made under Neb. Rev. Stat. § 60-6,211.02 (Reissue 2021) are required to be performed according to methods approved by DHHS. § 60-6,201; *State v. Alkazahy*, 314 Neb. 406, 412-13, 990 N.W.2d 740, 745 (2023). 177 Neb. Admin. Code, ch. 1, § 006.04 (2016), sets forth the list of approved methods for Class A permitees to conduct blood tests, and those methods include (1) gas chromatography, (2) enzymatic alcohol dehydrogenase, and (3)radiative energy attenuation. As such, gas chromatography is a regulatory approved method for testing blood and the regulations do not distinguish between single-column or dual-column testing. In support of his contention that the single-column test is no longer scientifically valid, Rudloff asserts that Dr. Bowen, a pathologist who testified during a pretrial motion, opined that the single-column analysis is not reliable. However, our review of the record indicates otherwise. Dr. Bowen testified during that pretrial hearing that "there are several ways to do the test, but the bi-column gas chromatograph method is probably state of the art." Dr. Bowen did not opine as to the accuracy or reliability of the single-column gas chromatography method and he asserted that he had no specific familiarity with gas chromatography.

Conversely, Dr. Henry Nipper, the State's expert, testified that although dual-column chromatography was a welcome advancement in gas chromatography and removed some doubt as to the accuracy of single-column chromatography results, single-column chromatography was utilized for many years and is still considered an accurate testing methodology that can be reasonably relied on in analyzing blood alcohol concentration and was still a "highly reliable technique."

Although Rudloff's expert, Kevin Schug, opined that the State's results were not scientifically reliable, based on how the test was conducted and how the chromatograph was calibrated or validated prior to testing Rudloff's blood sample, this testimony was refuted by the testimony of Dr. TeSelle and Dr. Nipper. Further, that claim goes to the application of the methodology and is not a challenge to the scientific validity of the methodology itself.

Based on our review of the record, we cannot say that the district court erred in finding that the trial court did not abuse its discretion in allowing testimony governing the single-column gas chromatography method of analysis, as the evidence supported a finding that single-column gas chromatography was a scientifically valid method of testing blood for alcohol content. This assignment of error fails.

(b) Title 177 Requirements

Rudloff next asserts that his blood test results should not have been admitted because the State failed to comply with title 177. Rudloff asserts that that the blood sample was not properly preserved and refrigerated under 177 Neb. Admin. Code, ch. 1, § 005.04 (2016), and therefore was inadmissible.

Section 005.04 provides that in collecting and preserving a specimen, "[w]hile not in transit to be tested, or while not under examination, all blood specimens shall be refrigerated as soon as practical."

Although Rudloff asserts that the blood test results were inadmissible because the State failed to show compliance with title 177, the Nebraska Supreme Court held in *State v. Green*, 223 Neb. 338, 389 N.W.2d 557 (1986), that any deficiencies in the techniques used to test the blood alcohol level in DUI cases generally are of no foundational consequence but affect only the weight and credibility of the testimony. See also *State v. Trampe*, 12 Neb. App. 139, 668 N.W.2d 281 (2003).

In the present case, Deputy Murphy testified that she placed the blood samples in her refrigerator until she turned the samples over to the evidence laboratory at the sheriff's office. Chad McCumbers from the sheriff's office testified that he received Rudloff's blood sample kit from Deputy Murphy and that the kit was maintained in an evidence locker until he placed it into the mail the following Monday morning. Dr. TeSelle testified that when she received the blood sample kit, the blood vials were placed into the refrigerator until she was ready to test them. She testified that the blood sample was "unclotted and acceptable for testing" and that the blood vials each contained sodium fluoride, a preservative, and potassium oxalate, an anticoagulant to keep the blood in liquid form.

As stated before, § 005.04 provides that "[w]hile not in transit to be tested, or while not under examination, all blood specimens shall be refrigerated as soon as practical." Whether the blood here was refrigerated as soon as practical is a matter we need not decide, as such an alleged deficiency would affect the weight and credibility of the testimony, not the foundation for its admission. See *State v. Jones,* No. A-06-959, 2007 WL 1816466 (Neb. App. June 26, 2007) (not designated for permanent publication). Rudloff's specific assignment that the tests results should not have been admissible because of an alleged gap in refrigeration fails.

(c) Chain of Custody

Rudloff next asserts that the blood test results were inadmissible because the State failed to prove the chain of custody to the final custodian of that evidence. Where objects pass through several hands before being produced in court, it is necessary to establish a complete chain of evidence, tracing the possession of the object or article to the final custodian; and if one link in the chain is missing, the object may not be introduced in evidence. *State v. Osborne*, 313 Neb. 726, 986 N.W.2d 65 (2023). Objects which relate to or explain the issues or form a part of a transaction are admissible in evidence only when duly identified and shown to be in substantially the same condition as at the time in issue. *Id.* It must be shown to the satisfaction of the trial court that no substantial change has taken place in an exhibit so as to render it misleading. *Id.* Important in determining the chain of custody are the nature of the evidence, the circumstances surrounding its preservation and custody, and the likelihood of intermeddlers tampering with the object. *Id.* Whether there is sufficient foundation to admit physical evidence is determined on a case-by-case basis. *Id.*

It is difficult to decipher exactly what Rudloff is arguing here. He claims that the test results should not have been admitted because inadequate foundation was laid for the chain of custody. However, his specific argument in support of that assignment of error is that "the State failed to establish foundation for the blood test results, more specifically, in failing to submit the blood vials, or at least copies of the blood vials, as evidence."

Insofar as the chain of custody from the time the blood was collected until it was tested, Deputy Murphy testified that she transported Rudloff to the medical center for a blood draw and, following the blood draw, she placed Rudloff's two blood vials back into the kit, which was sealed with tamper resistant tape, and the box containing the vials was then sealed at the hospital. Deputy Murphy testified that after transporting Rudloff to the detention facility, she went home and placed the blood sample kit into her refrigerator. The following day, Deputy Murphy turned over Rudloff's blood sample kit to the evidence laboratory at the sheriff's office after she placed the appropriate paperwork in the outer box and sealed the box with blue tamper-resistant tape. Chad McCumbers testified that when he received the blood sample kit, it was sealed and undamaged and that the blood sample kit remained in an evidence locker until he mailed it on Monday morning. Dr. TeSelle testified that when she received the blood sample kit, it was sealed with tamper resistant tape, and that the sample was "unclotted and acceptable for testing."

Based on our review of the record, we conclude that the district court did not err in finding that the evidence presented by the State was sufficient to establish the chain of custody and provide foundation for the blood tests results.

Regarding Rudloff's argument that the State failed to offer the blood vials themselves into evidence, Rudloff provides one line in his brief expounding on this topic. He argues that "[t]he [S]tate failed to establish the foundation for the blood test result, more specifically, in failing to submit the blood vials, or at least copies of the blood vials, as evidence." Brief for appellant at 18.

For clarity, during the trial, the State showed a photo of the blood vials to witnesses, including Deputy Murphy, and Rudloff's counsel objected on the bases of best evidence, hearsay, and foundation. Rudloff never separately objected on the basis of chain of custody as it related to the blood vials or pictures thereof when discussed during the trial. But Rudloff raises this argument under the section in his brief for his assigned error that "[t]he District Court erred in affirming the County Court's admission of the blood test when: . . . [t]he [S]tate failed to establish the chain of custody and when the blood vials, or photocopies, were not admitted as evidence." As stated above, the State provided sufficient evidence of the chain of custody to Rudloff's blood through the date the blood was tested, thereby providing sufficient foundation for the admission of the test results. And Rudloff simply fails to provide any argument regarding how the State's failure to submit the blood vials into evidence at trial was of legal consequence. Stated differently, Rudloff fails to argue the legal basis for his claim that the State erred in not placing the blood vials or photographs of the blood vials into evidence at trial. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *State v. Denton*, 307 Neb. 400, 949 N.W.2d 344 (2020). Having failed to sufficiently argue the basis of the claim, we will not further address it.

## 2. DENIAL OF MOTION TO SUPPRESS

Rudloff next assigns that the district court erred in affirming the county court's order overruling his motion to suppress because the county court made factual determinations not supported by the evidence; erred in finding that there was reasonable suspicion to request standardized field sobriety tests; and erred in determining that there was probable cause to arrest Rudloff for DUI.

In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Hartzell*, 304 Neb. 82, 933 N.W.2d 441 (2019). Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protection is a question of law that an appellate court reviews independently of the trial court's determination. *Id.* When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress. *Id.*

### (a) Factual Findings

Rudloff's motion to suppress requested the suppression of evidence obtained by officers after extending their initial stop of Rudloff to investigate him for DUI. Rudloff claimed that officers lacked reasonable, articulable suspicion to continue to detain him following the initial stop, and that this warrantless seizure violated his Fourth Amendment rights.

Evidence of the rationale for extending the stop and performing the DUI investigation was primarily supplied by Deputy Murphy, who testified that she performed further investigation after observing Rudloff's bloodshot, watery eyes, his slurred speech, the strong odor of alcohol, and his admission to drinking a "couple" of beers. In its order, the county court found that Deputy Murphy's testimony provided a reasonable, articulable basis to extend the stop and perform further investigation. Rudloff first takes issue with that finding arguing that the county court relied too heavily on Deputy Murphy's testimony and failed to consider that the testimony was not corroborated by police camera footage or other evidence supplied.

However, when reviewing a trial court's findings of fact on a motion to suppress, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *State v. Briggs*, 308 Neb. 84, 953 N.W.2d 41 (2021). To the extent Rudloff is asking this court to reweigh the evidence, we will not do so. And to the extent Rudloff is suggesting that the court's acceptance of Deputy Murphy's testimony in light of other evidence supplied constituted clear error, following our de novo review, we find that it was not. See *State v. Perry*, 318 Neb. 613, 17 N.W.3d 504 (2025) (holding that ultimate determinations of reasonable suspicion to conduct investigatory stop and probable cause to perform warrantless search are reviewed de novo and findings of fact are reviewed for clear error, giving due weight to inferences drawn from those facts by trial judge).

### (b) Reasonable Suspicion to Extend Detention

Rudloff next argues that the county court erred in finding that officers, on this record, had sufficient reasonable, articulable suspicion to extend the stop of Rudloff to conduct a DUI investigation. A similar argument was made in *State v. Lamb*, 280 Neb. 738, 789 N.W.2d 918 (2010), *disapproved on other grounds, State v. Melton*, 308 Neb. 159, 953 N.W.2d 246 (2021). In *Lamb*, officers similarly stopped the defendant for a traffic violation but extended the stop to conduct a DUI investigation after observing the defendant and smelling the odor of alcohol on his person. In addressing the legal basis to extend the stop to conduct a DUI investigation, the court stated:

Once a vehicle is lawfully stopped, a law enforcement officer may conduct an investigation reasonably related in scope to the circumstances that justified the traffic stop. *State v. Prescott*[, 280 Neb 96, 784 N.W. 2d 873 (2010)]. In order to continue to detain a motorist, an officer must have a reasonable, articulable suspicion that the person is involved in criminal activity beyond that which initially justified the stop. *Id.* We have further held that an officer is required to have only a reasonable, articulable suspicion that a motorist was driving under the influence in order to expand the scope of the initial traffic stop and detain him or her for field sobriety tests. *Id.* Whether a police officer has a reasonable suspicion based on sufficient articulable facts depends on the totality of the circumstances. *Id.* Courts must determine whether reasonable suspicion exists on a case-by-case basis. *Id.* Reasonable suspicion entails some minimal level of objective justification for detention. Id. It is something more than an inchoate and unparticularized hunch, but less than the level of suspicion required for probable cause. *Id.*

*State v. Lamb*, 280 Neb. at 747, 789 N.W.2d at 927.

In finding the record in *Lamb* supported expanding the investigation, the court held:

Here, the officer who stopped [the defendant's] vehicle did have a reasonable, articulable suspicion to expand the scope of the initial traffic stop. The officer testified that after stopping the vehicle, he approached the vehicle and observed that [the defendant's] movements were very deliberate and that [the defendant] had to concentrate on what the officer had asked [the defendant] to provide to the officer. The officer further testified that he smelled the odor of alcohol and that because he suspected alcohol use, he asked [the defendant] to exit the vehicle to conduct field sobriety tests. Based on [the defendant's] performance on these tests, the officer believed that [the defendant] was under the influence of alcohol. The officer arrested [the defendant] and transported him to the Lincoln Police Department.

*State v. Lamb*, 280 Neb. at 747-48, 789 N.W.2d at 927 (2010).

In ruling on the motion to suppress, the county court noted that Rudloff did not argue that the initial stop was unlawful but rather contested that the officer had reasonable suspicion to further detain Rudloff for a DUI investigation and then probable cause to arrest him thereafter. The county court found that based on Deputy Murphy's observations of Rudloff, she had reasonable suspicion to continue to detain Rudloff for a DUI investigation, and following her receipt of the PBT results, she had probable cause to arrest Rudloff.

Based on our review of the record, Deputy Murphy testified that she began following Rudloff's vehicle after observing Rudloff make a U-turn without signaling and that his vehicle had an inoperable taillight and no rear license plate. After initiating a traffic stop and contacting Rudloff, Deputy Murphy observed that Rudloff had slurred speech, had trouble balancing, had bloodshot and watery eyes, and she could smell the odor of alcoholic beverage emanating from his person. At that point, Deputy Murphy further detained Rudloff for a DUI investigation. Deputy Murphy asked Rudloff whether he had been drinking any alcoholic beverages, to which Rudloff replied that he had "a couple." Deputy Murphy then proceeded to ask Rudloff to submit to standardized field sobriety tests and Rudloff complied. During the field sobriety tests, Deputy

Murphy observed numerous signs of impairment and noted that Rudloff did not pass any of the field sobriety tests. Deputy Murphy then asked Rudloff to submit to the preliminary breath test and he again complied. Following the failing result of the PBT, Deputy Murphy placed Rudloff under arrest, provided him with the Post Arrest Chemical Test Advisement form, and obtained his consent to obtain a blood sample. Video footage of the interaction was received into evidence during the motion to suppress.

Based upon our de novo review of the record, we find that Deputy Murphy had reasonable articulable suspicion to expand the scope of the initial stop to perform a DUI investigation. See *State v. Prescott*, 280 Neb. 96, 784 N.W.2d 873 (2010).

### (c) Probable Cause to Arrest for DUI

Rudloff finally contends that Deputy Murphy did not have probable cause to arrest him. We disagree.

An arrest is a highly intrusive detention (seizure) of a person that must be justified by probable cause. *State v. Porter*, 33 Neb. App. 453, 17 N.W.3d 219 (2025). Probable cause to support a warrantless arrest exists only if the officer has knowledge at the time of the arrest, based on information that is reasonably trustworthy under the circumstances, that would cause a reasonably cautious person to believe that a suspect has committed or is committing a crime. *Id.* Probable cause is a flexible, commonsense standard that depends on the totality of the circumstances. *Id.* We determine whether probable cause existed under an objective standard of reasonableness, given the known facts and circumstances. *Id.*

Here, Deputy Murphy testified that Rudloff admitted to drinking "a couple" alcoholic beverages. Further, Deputy Murphy performed three different field sobriety tests and conducted those tests in accordance with her training as a law enforcement officer. Deputy Murphy testified that she observed numerous signs of impairment when Rudloff completed two of the tests, and that Rudloff was unable to complete one of the tests. After observing signs of impairment during the field sobriety tests, Deputy Murphy performed a PBT test on Rudloff, which indicated that he had failed. Accordingly, Deputy Murphy had probable cause to believe that Rudloff had committed the crime of DUI and the right to arrest him. This assignment of error fails.

### 3. ADMISSION OF HORIZONAL GAZE NYSTAGMUS TEST

Rudloff assigns that the district court erred in affirming the county court's decision admitting the HGN test when the test was not properly performed and the deputy improperly equated performance on the test to impairment.

During the trial, Deputy Murphy testified that she performed various field sobriety tests on Rudloff including the HGN test. Over Rudloff's objection based on Neb. Evid. R. 702, Deputy Murphy testified that she instructed Rudloff to stand with his feet together, arms at his sides, and follow the tip of her pen with his eyes only and not move his head. Deputy Murphy testified that when observing Rudloff's eyes, she noted six signs of impairment. A copy of Deputy Murphy's patrol car dash camera footage was offered and received into evidence.

Rudloff contends that Deputy Murphy did not perform the HGN field sobriety test in compliance with the National Highway Traffic Safety Administration manual when she failed to perform all the medical passes prior to moving on to the next step. More specifically, Rudloff

argues that Deputy Murphy was "required to check each eye twice, or a total of six passes plus the medical assessment. When she made her passes, instead of a total of six passes for each eye, she made four for one eye and three for the other." Brief for appellant at 26. Rudloff further contends that Deputy Murphy was then allowed to testify as to her observations of the signs of impairment in conducting the HGN test, and that without showing that the test was properly administered, appropriate foundation for the admission of the test had not been laid.

In *State v. Prescott*, 280 Neb. 96, 784 N.W.2d 873 (2010), the Nebraska Supreme Court addressed a similar argument wherein the defendant argued that the field sobriety tests failed to establish that he was impaired and that the officer lacked probable cause to arrest him because the officer did not perform the test in compliance with the requirements sets forth in the National Highway Traffic Safety Administration manual. The Nebraska Supreme Court stated:

> Starting first with the HGN test, [the defendant] argues that [the officer] did not perform the test in keeping with the requirements set forth in the National Highway Traffic Safety Administration manual detailing the test. In particular, [the defendant] complains that the manual indicates that the test should take 80 seconds, but that it did not take [the officer] 80 seconds to administer the test.
>
> This court has held that a police officer may testify to the results of HGN field sobriety testing if it is shown that the officer has been adequately trained in the administration and assessment of the test and has conducted the testing and assessment in accordance with that training.
>
> In this case, [the officer] testified to his training regarding the HGN test. He explained what the HGN test was and explained that impaired persons often show an involuntary jerking of the eye, known as nystagmus. In addition, [the officer] explained the steps he took to administer the test to [the defendant] and testified that [the defendant] showed four indicators on the test, demonstrating impairment. This finding of impairment is consistent with the manual. The manual indicates that with four indicators present, it is likely that a person's blood alcohol concentration is above .10.
>
> [The defendant's] argument appears to be without merit. First, it is not at all clear from the record exactly how long it took [the officer] to perform the test. Nor is there anything in the record, in particular in the manual, suggesting that the HGN indicators are not valid if the test did not take 80 seconds to perform. Finally, the manual itself notes: "The procedures outlined in this manual describe how the [field sobriety tests] are to be administered under ideal conditions. We recognize that the [tests] will not always be administered under ideal conditions in the field, because such conditions will not always exist. Even when administered under less than ideal conditions, they will generally serve as valid and useful indicators of impairment. Slight variations from the ideal . . . may have some affect [sic] on the evidentiary weight given to the results. However, this does not necessarily make the [tests] invalid."

*State v. Prescott,* 280 Neb. at 103-05, 784 N.W.2d at 881-82.

Similarly, here, Deputy Murphy testified to her training and experience regarding the HGN test. Deputy Murphy testified that she instructed Rudloff on how to perform the HGN test and asked whether Rudloff wore contacts or glasses. Deputy Murphy testified that she proceeded to

complete the HGN test according to her training. She testified that she checked for equal pupil size, for equal tracking, for distinct and sustained nystagmus at maximum engagement, and then for onset of nystagmus prior to 45 degrees. Deputy Murphy explained that there are six clues for impairment and that in performing the HGN test on Rudloff, she observed all six. She testified that "[t]he first one was lack of smooth pursuit in . . . both the left and the right eye, distinct and sustained nystagmus at maximum deviation in both the left and the right eye, and nystagmus prior to 45 degrees in both the left and the right eye." Although Deputy Murphy testified that she did not believe that she did all the medical passes, she stated that she performed the tests the way that she had been trained and always practiced. As stated in *State v. Prescott*, 280 Neb. 96, 784 N.W.2d 873 (2010), the failure to perform the test under the ideal conditions as stated in the National Highway Traffic Safety Administration manual does not affect the admissibility of the results but rather goes to the weight and credibility of the evidence. Therefore, it was not error for the county court to admit the HGN results during the trial over Rudloff's objection. This assignment of error fails.

### 4. DENIAL OF MOTION FOR DIRECTED VERDICT

Rudloff assigns that the district court erred in confirming the county court's order overruling his motion for directed verdict as to the .08 prong of the offense or finding that the evidence was sufficient to find that Rudloff had a .08 blood alcohol level. He argues that because there was doubt about the test result, the evidence was insufficient to support his conviction.

A defendant who moves for a directed verdict at the close of the evidence in the State's case in chief in a criminal prosecution, and who, when the court overrules the dismissal or directed verdict motion, proceeds with trial and introduces evidence, waives the appellate right to challenge correctness in the trial court's overruling the motion for a directed verdict, but may challenge sufficiency of the evidence for the defendant's conviction. *State v. Pauly,* 311 Neb. 418, 972 N.W.2d 907 (2022).

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *Id.*

Here, Rudloff contends that the blood test was not performed properly and the State's expert conceded that under the testing used in the case there were doubts regarding the accuracy and reliability of the results. As we stated earlier, we find that the record refutes Rudloff's claim that the State conceded that the single-column gas chromatography methodology was unreliable. This assignment of error lacks merit for the same reasons. There was no error by the county court in admitting the results of the blood test and no error by the district court in affirming the county court on this issue. The evidence was sufficient to sustain Rudloff's conviction as it related to his blood-alcohol content and the district court did not err in affirming the county court conviction.

## VI. CONCLUSION

For the reasons stated above, we affirm Rudloff's conviction and sentence.

AFFIRMED.